Michael J. Gearin, wsba # 20982
David C. Neu, wsba # 33143
Brian L. Lewis, wsba # 33560
K&L GATES LLP
925 Fourth Avenue, Suite 2900
Seattle, WA 98104-1158
(206) 623-7580

Honorable Karen A. Overstreet
Chapter : 11
Hearing Location: 700 Stewart St.
               Room 7206
               Seattle, WA
Hearing Time: 9:30 am
Hearing Date: September 28, 2010
Response Date: Hearing Date

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF WASHINGTON

In re:

COAST CRANE COMPANY,

               Debtor.

Case No. 10-21229-KAO

## INTERIM ORDER (I) AUTHORIZING DEBTOR TO OBTAIN POSTPETITION FINANCING PURSUANT TO SECTION 364 OF THE BANKRUPTCY CODE, (II) AUTHORIZING THE USE OF CASH COLLATERAL PURSUANT TO SECTION 363 OF THE BANKRUPTCY CODE, (III) GRANTING ADEQUATE PROTECTION TO THE PREPETITION LENDERS PURSUANT TO SECTIONS 361, 362, 363 AND 364 OF THE BANKRUPTCY CODE, (IV) GRANTING LIENS AND SUPERPRIORITY CLAIMS, (V) SCHEDULING A FINAL HEARING ON THE DEBTOR'S MOTION TO INCUR SUCH FINANCING ON A PERMANENT BASIS

This matter is before the Court on the motion (Docket No. 11, the "Motion") filed by Coast Crane Company, as debtor and debtor-in-possession (the "Debtor") [1] in the above-captioned chapter 11 case (the "Case") requesting entry of an order (the "Order"), on an interim and final basis, among other things:[2]

---

[1] The Debtor is Coast Crane Company, a Delaware corporation (EIN 32-0120926).
[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in

INTERIM ORDER - 1
(Case No. 10-21229-KAO)
K:\2065889\00015\20892_MJG\20892P242A

(1)     Authorizing and approving, pursuant to sections 105, 361, 362, 363 and 364 of title 11 of the United States Code (the "Bankruptcy Code") and Rules 2002, 4001, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for the Debtor, as Borrower, and the other Credit Parties signatory thereto to obtain postpetition financing up to the principal amount of $20,000,000 (the "DIP Facility") from PNC Bank, National Association (in its individual capacity, "PNC Bank"), for itself as a DIP Lender, and as administrative agent for the DIP Lenders (in such capacity, the "DIP Agent"), and the other lenders from time to time parties to the DIP Facility Agreement (as defined below) (collectively, in their lender capacity, the "DIP Lenders"), to (A) fund, among other things, ongoing working capital, general corporate, and other financing needs of the Debtor, (B) pay down the Revolving Advances (as defined below), which amounts are stipulated to be secured by the Prepetition Collateral (as defined below), (C) provide the Prepetition Agent and Prepetition Lenders with the Adequate Protection (each as defined below), (D) pay certain transaction fees, and other costs and expenses of administration of the Case, and (E) pay fees and expenses (including, without limitation, reasonable fees and expenses of counsel and financial advisors) owed to the DIP Agent and the DIP Lenders under the DIP Facility Documents (obligations under the DIP Facility and under this Interim Order, including, without limitation, principal, accrued interest, unpaid reasonable fees and expenses, and all other obligations and amounts due from time to time under the DIP Facility Documents (as defined below) shall be referred to hereinafter collectively as the "Postpetition Indebtedness");

(2)     Authorizing and empowering the Debtor to execute and enter into the DIP Facility Documents and to perform such other and further acts as may be required in connection with the DIP Facility Documents;

(3)     providing, pursuant to section 364(c) and (d) of the Bankruptcy Code, that the obligations under the DIP Facility:

---

the DIP Facility Agreement (defined below).

INTERIM ORDER - 2
(Case No. 10-21229-KAO)
K:\2065889\00015\20892_MJG\20892P242A

a. have priority over any and all administrative expenses, including, without limitation, the kind specified in sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1113, or 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other consensual or non-consensual lien, levy or attachment, whether incurred in the Case or any successor case, which allowed superpriority claims of the DIP Agent and DIP Lenders shall be payable from, and have recourse to, all prepetition and postpetition property of the Debtor as provided herein (other than from the Avoidance Actions and proceeds thereof), subject to the payment in full in cash of the Carve-Out (as defined below) and, to the extent payable, the Purchaser Break-Up Fee and Expense Reimbursement[3] (the "<u>DIP Facility Superpriority Claims</u>"); and

b. be and be deemed immediately secured by valid, binding, continuing, enforceable, fully perfected and unavoidable first priority senior priming security interests and liens (the "<u>DIP Facility Liens</u>") in and on all prepetition and postpetition property and assets of the Debtor, whether real or personal, tangible or intangible, and wherever located, and whether now existing or hereafter acquired, including proceeds, products, offspring, rents and profits thereof (the "<u>Collateral</u>"), subject only to the Carve-Out and the Permitted Prior Liens and, to the extent payable, the Purchaser Break-Up Fee and Expense Reimbursement; <u>provided</u>, <u>however</u>, that the Collateral shall not include avoidance actions and/or the proceeds thereof pursuant to sections 502(d), 544, 545, 547, 548, 549, 550 or 553 of the Bankruptcy Code (the "<u>Avoidance Actions</u>");

(4) authorizing the Debtor pursuant to sections 361 and 363(c) and (e) of the Bankruptcy Code to use "cash collateral" (as defined under section 363 of the Bankruptcy Code) and provide Adequate Protection as defined in below to the Prepetition Agent and Prepetition Lenders on account of their claims under the Prepetition Loan Documents (as

---

[3] As used herein, the term "Purchaser Break-Up Fee and Expense Reimbursement" means the break-up fee and expense reimbursement, if any, to be paid to the Purchaser by the Debtor in accordance with the Purchase Agreement, subject to approval of this Court.

defined below) for any diminution in the value of their respective interests in the Prepetition Collateral (as defined below) caused by the use of Cash Collateral and the terms of the financing being granted herein; and

(5)     scheduling, pursuant to Bankruptcy Rule 4001, a final hearing (the "Final Hearing") before this Court to consider entry of an order approving the DIP Facility, authorizing the use of Cash Collateral, and authorizing the grant of Adequate Protection to the Prepetition Agent and Prepetition Lenders, all on a final basis (the "Final Order"), as set forth in the Motion.

Pursuant to Bankruptcy Rules 4001(b) and 4001(c)(1), due and sufficient notice under the circumstances of the Motion and the interim hearing on the Motion before this Court to consider entry of this Interim Order (the "Interim Hearing") having been provided by the Debtor as set forth in paragraph I below, and the Interim Hearing having been held on September 24, 2010 and a further Interim Hearing having been held on September 28, 2010, and the Court having considered of all the pleadings filed with this Court, including any objections to the relief requested in the Motion that were not withdrawn or resolved at or prior to the hearing; and upon the record made by the Debtor at the Interim Hearing and the Declaration of Matthew W. Hudson (Docket No. 12) and Tom Neary (Docket No. 15), and after due deliberation and consideration and good and sufficient cause appearing therefore;

IT IS HEREBY FOUND:

A.     On September 22, 2010 (the "Petition Date"), the Debtor commenced in this Court a case under chapter 11 of the Bankruptcy Code. The Debtor is continuing to operate its respective businesses and manage its respective properties as debtor in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

B.     No request for the appointment of a trustee or examiner has been made in this Case. The Official Committee of Unsecured Creditors (the "Committee") has been appointed or designated by the U.S. Trustee's office. As of the date of the hearing on this Interim Order, counsel for the Committee has appeared.

C.   This Court has subject matter jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

D.   Subject to the rights of any non-Debtor party in interest as provided in paragraph 6 herein, the Debtor acknowledges, agrees and stipulates that:

(i)   Pursuant to that certain Revolving Credit and Security Agreement, dated as of May 18, 2007, among NCA Crane Acquisition Co., Inc., Coast Crane Holdings, Inc., and Coast Crane Company, PNC Bank, as a Prepetition Lender and administrative and collateral agent (in such capacity, the "Prepetition Agent"), and Wells Fargo Bank, N.A. and Colonial Pacific Leasing Corporation as lenders (each, a "Prepetition Lender" and collectively in their lender capacity, the "Prepetition Lenders") party thereto (as amended, supplemented, or otherwise modified as of the Petition Date, the "Prepetition Credit Agreement"; and together with all other agreements, documents, notes, instruments and any other agreements delivered pursuant thereto or in connection therewith, the "Prepetition Loan Documents"), the Prepetition Lenders made loans, and provided other financial accommodations to or for the benefit of the Debtor;

(ii)   Pursuant to the Prepetition Loan Documents, the Debtor was, as of the Petition Date, indebted to the Prepetition Agent and the Prepetition Lenders in the amount of $75,374,072 with respect to "Revolving Advances" (as defined in the Prepetition Credit Agreement, the "Revolver"), plus accrued and unpaid fees, costs and expenses due and owing thereunder;

(iii)   For purposes of this Interim Order, the term "Prepetition Indebtedness" shall mean and include, without duplication, any and all amounts owing or outstanding under the Prepetition Loan Documents (including, without limitation, all "Obligations" as defined in the Prepetition Credit Agreement), and all interest on, fees and other costs, expenses and charges owing in respect of, such amounts (including,

without limitation, any reasonable attorneys', accountants', financial advisors' and other fees and expenses that are chargeable or reimbursable under the applicable provisions of the Prepetition Loan Documents), and any and all obligations and liabilities, contingent or otherwise, owed with respect to other obligations outstanding thereunder;

(iv)    Pursuant to the Prepetition Loan Documents, the Debtor granted to the Prepetition Agent, for the benefit of the Prepetition Lenders, liens and security interests (the "Prepetition Liens") on and in substantially all of the Debtor's property and assets whether real or personal, tangible or intangible, and wherever located, and whether now or hereafter existing or acquired, and all the proceeds, products, offspring, rents and profits thereof (the "Prepetition Collateral") to secure the Prepetition Indebtedness and guaranties thereof;

(v)    As of the Petition Date and immediately prior to giving effect to this Interim Order, but subject to the rights of any non-Debtor party in interest as provided in paragraph 6 of this Interim Order, (a) the Prepetition Loan Documents are valid and binding agreements and obligations of the Debtor, (b) the Prepetition Liens (i) constitute valid, binding, enforceable and perfected first priority security interests and liens, subject only to the Permitted Encumbrances (as defined in the Prepetition Credit Agreement) and (ii) are not subject to avoidance, reduction, disallowance or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law, (c) the Prepetition Indebtedness constitutes the legal, valid and binding obligations of the Debtor, and the Prepetition Indebtedness, and any amounts paid at any time to the Prepetition Agent or any Prepetition Lender on account thereof or with respect thereto, are not subject to (i) any objection, offset, defense or counterclaim of any kind or nature, or (ii) avoidance, reduction, disallowance, recharacterization or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law, and (d) no claims of the Debtor exist against the Prepetition Agent or any Prepetition Lender under any contract or tort (including, without limitation, lender liability) theories of recovery or

pursuant to section 105 or chapter 5 (including, without limitation, sections 510, 544, 547, 548, 549 or 550) of the Bankruptcy Code; and

(vi)     Subject to the rights of any non-Debtor party in interest as provided in paragraph 6 of this Interim Order, the Debtor has waived, discharged and released any right it may have to challenge any of the Prepetition Indebtedness and the security for those obligations, and to assert any offsets, defenses, claims, objections, challenges, causes of action and/or choses of action against the Prepetition Agent, the Prepetition Lenders and/or any of their respective affiliates, parents, subsidiaries, agents, attorneys, advisors, professionals, officers, directors and employees (in their respective capacities as such).

E.       The Debtor's business has an immediate need for financing under the DIP Facility and use of Cash Collateral in order to permit, among other things, the orderly continuation of the operation of its business, to maintain business relationships with vendors, suppliers and customers, to make payroll, to make capital expenditures and to satisfy other working capital and operational, financial and general corporate needs. The access of the Debtor to sufficient working capital and liquidity through the incurrence of new indebtedness for borrowed money and other financial accommodations and use of Cash Collateral is vital to the preservation and maintenance of the going concern values of the Debtor and to the success of the Case. Without such credit and use of Cash Collateral, the Debtor would not be able to operate its business and the Debtor's estate would be irreparably harmed.

F.       The Debtor is unable to obtain sufficient financing from sources other than the DIP Lenders on terms more favorable than under the DIP Facility and all the documents and instruments delivered pursuant thereto or in connection therewith (inclusive of the DIP Facility Agreement (as defined below), the "DIP Facility Documents"). The Debtor has been unable to obtain sufficient unsecured credit solely under section 503(b) (1) of the Bankruptcy Code as an administrative expense. New credit is unavailable to the Debtor without providing (a) the DIP Agent, for the benefit of the DIP Lenders, the DIP Facility

1 Superpriority Claims and the DIP Facility Liens as provided herein and in the DIP Facility

2 Documents, and (b) the Prepetition Agent and Prepetition Lenders with Adequate Protection of

3 their interests in the Prepetition Collateral on the terms and conditions as set forth herein.

4       G.     Pending entry of the Final Order, the DIP Agent, DIP Lenders,

5 Prepetition Agent, and Prepetition Lenders are willing to provide financing to the Debtor and/or

6 consent to the use of Cash Collateral and other Collateral by the Debtor subject to (i) the entry

7 of this Interim Order, (ii) the terms and conditions of the DIP Facility Documents, and

8 (iii) findings by the Court that such interim postpetition financing and use of Cash Collateral is

9 essential to the Debtor's estates, that the terms of such interim financing and use of Cash

10 Collateral were negotiated in good faith and at arm's length, and that the DIP Facility Liens,

11 DIP Facility Superpriority Claims, and the other protections granted pursuant to this Interim

12 Order and the DIP Facility Documents with respect to such interim financing and use of Cash

13 Collateral will not be affected by any subsequent reversal, modification, vacatur, or amendment

14 of this Interim Order or any other order, as provided in section 364(e) of the Bankruptcy Code.

15 Without limiting the foregoing, any advances made to the Debtor under the DIP Facility

16 Documents after entry of this Interim Order and prior to entry of the Final Order shall be

17 entitled to the protections provided by section 364(e) of the Bankruptcy Code. The DIP Agent,

18 DIP Lenders, Prepetition Agent, and Prepetition Lenders have each acted in good faith in, as

19 applicable, negotiating, consenting to and agreeing to provide the postpetition financing

20 arrangements and/or use of Cash Collateral on an interim basis as contemplated by this Interim

21 Order and the other DIP Facility Documents, and the reliance by the DIP Agent, DIP Lenders,

22 Prepetition Agent, and Prepetition Lenders on the assurances referred to above is in good faith.

23       H.     Telephonic, facsimile notice or overnight mail notice of the Interim

24 Hearing and the proposed entry of this Interim Order has been provided to (a) the twenty

25 (20) largest creditors listed in the Debtor's list of creditors (excluding insiders), (b) the Office

26 of the United States Trustee for the Western District of Washington (the "U.S. Trustee"),

27 (c) counsel to the DIP Agent and Prepetition Agent, (d) Knott Partners, L.P., as successor in

INTERIM ORDER - 8
(Case No. 10-21229-KAO)
K:\2065889\00015\20892_MJG\20892P242A

interest to JPM Mezzanine Capital, LLC (the "Junior Lender") under that certain Term Loan and Security Agreement dated May 18, 2007 to which the Debtor is a party ("Junior Loan Agreement"); (e) all known parties asserting a lien against the Collateral, (e) the U.S. Attorney, (f) the Attorney General for the State of Washington, and (g) any other party that has filed a request for notice pursuant to Bankruptcy Rule 2002 or is required to receive notice under the Bankruptcy Rules and Local Bankruptcy Rules (collectively, the "Notice Parties"). Under all the exigent circumstances, the requisite notice of the Motion and the relief requested thereby and this Interim Order has been provided in accordance with Bankruptcy Rule 4001.

   I.   The Debtor has requested immediate entry of this Interim Order pursuant to Bankruptcy Rules 4001(b) (2) and 4001(c) (2). Absent entry of this Interim Order, the Debtor's business, properties and estates will be immediately and irreparably harmed.

   J.   The ability of the Debtor to finance its operations and the availability to the Debtor of sufficient working capital and other financial and general corporate liquidity through the incurrence of new indebtedness for borrowed money and other financial accommodations, and use of Cash Collateral are in the best interests of the Debtor and its creditors and estate. The primary purpose of the financing and use of cash collateral authorized hereunder is to enable the Debtors to continue operations pending the consummation of the sale of substantially all of the Debtors' assets to Coast Rainier Acquisition Company or its assigns (collectively, the "Purchaser") pursuant to that certain Asset Purchase Agreement (the "Purchase Agreement") dated September 21, 2010, subject to the Debtors' receipt of higher and better bids in accordance with bidding procedures described in the Debtors' Motion for Order, Inter Alia, (i) Scheduling a Hearing to Approve Asset Purchase Agreement with Coast Rainier Acquisition Company for Sale of Debtor's Assets, Free and Clear of Liens; (ii) Approving the Form and Manner of Notice; (iii) Approving Expense Reimbursement; (iv) Approving Bidding Procedures; and (v) Approving Procedures for Assumption and Assignment of Executory Contracts (Docket No. 17). The interim financing and use of Cash Collateral authorized hereunder is vital to avoid immediate irreparable harm to the Debtor's business, properties and

1  estates and to allow the orderly continuation of the Debtor's business pending the

2  consummation of a sale.

3      K.      Based upon the record presented by the Debtor to this Court:  (i) the

4  terms of the DIP Facility and use of Cash Collateral are the best available under the

5  circumstances, reflect the Debtor's exercise of prudent business judgment consistent with its

6  fiduciary duty, and are supported by reasonably equivalent value and fair consideration; and

7  (ii) the DIP Facility and use of Cash Collateral has been negotiated in good faith and at arm's

8  length among the Debtor, DIP Agent, DIP Lenders, Prepetition Agent and Prepetition Lenders,

9  and any loans, credit, use of Cash Collateral or other financial accommodations set forth in this

10  Interim Order shall be deemed to have been extended, issued, made, or consented to, as the

11  case may be, in "good faith" within the meaning of section 364(e) of the Bankruptcy Code.

12      L.      The Prepetition Agent and Prepetition Lenders have consented to the

13  relief sought in the Motion; provided, that such consent is expressly limited to: (i) the Debtor's

14  use of Cash Collateral solely on the terms and conditions set forth in this Interim Order; and

15  (ii) the postpetition financing being provided by the DIP Agent and DIP Lenders as

16  contemplated by this Interim Order and the DIP Facility Documents.  Nothing in this Interim

17  Order, including, without limitation, any of the provisions herein with respect to adequate

18  protection, shall constitute, or be deemed to constitute, a finding that the interests of the

19  Prepetition Agent and Prepetition Lenders are or will be adequately protected with respect to

20  any non-consensual use of Cash Collateral or priming of the Prepetition Liens.

21      M.      The Debtor asserts that pursuant to the terms of the Junior Loan

22  Agreement, to the extent the liens securing the indebtedness under the Prepetition Credit

23  Agreement are subordinated or *pari passu* with liens securing such postpetition financing, the

24  Prepetition Junior Liens will similarly be subordinated to the liens securing the postpetition

25  financing on the same basis as the Prepetition Junior Liens are subordinated to the liens

26  securing the indebtedness under the Prepetition Credit Agreement.

27

N.     The Debtor asserts that the Junior Lender is entitled to adequate protection for Debtor's proposed use of cash collateral to the extent permitted under the Intercreditor Agreement. Entry of this Interim Order shall not waive, limit or otherwise affect any rights, claims or defenses of any of the parties to the Intercreditor Agreement.

O.     The Debtor asserts that it entered into certain agreements with (i) Manitowoc Cranes, Inc. Grove U.S. LLC and National Crane Corporation (collectively, "Manitowoc/Grove") and (ii) De Lage Landen Financial Services ("DLL") pursuant to which Manitowoc/Grove and/or DLL may claim that they were granted purchase money security interests in certain equipment purchased by the Debtor and financed through DLL and/or Manitowoc/Grove and such security interests cover the proceeds of such equipment. Any issues with respect to the relative priority as between the liens and claims granted to the DIP Lenders or the Prepetition Lenders pursuant to this Interim Order and the liens of Manitowoc/Grove and DLL are reserved.

IT IS HEREBY ORDERED, ADJUDGED AND DECREED:

1.     <u>Disposition</u>. The Motion is granted as set forth in this Interim Order. Any objections that have not previously been withdrawn or resolved at the hearing are hereby overruled. This Interim Order shall immediately become effective upon its entry.

2.     <u>Authorization to Borrow Under the DIP Facility</u>. With its consent and agreement, the Debtor is deemed to have re-executed and re-delivered all documents comprising the Prepetition Credit Agreement as of the date hereof, which shall constitute, together with, a fully executed and delivered Modification to DIP Facility Agreement in substantially the form annexed to the Motion, the "<u>DIP Facility Agreement</u>". With its consent and agreement, the Debtor is deemed to have re-executed and re-delivered all the Prepetition Loan Documents, all of which shall constitute DIP Facility Documents. Provided that the Debtor is not in default under the terms of this Interim Order or the DIP Facility Agreement, the Debtor is authorized to borrow under the DIP Facility from the DIP Lenders, in accordance with the terms and conditions of the DIP Facility Agreement and only in the amounts and at the

times set forth in the budget attached to the DIP Facility Agreement (the "DIP Budget"), up to

$20,000,000 in an aggregate principal amount of advances (the "DIP Facility Amount")

(together with interest and reasonable fees, charges and expenses payable under the DIP

Facility Documents) , and to use amounts borrowed under the DIP Facility to fund the Debtor's

working capital and other general corporate needs pending the Final Hearing in accordance

with the terms of the DIP Facility Agreement and this Interim Order; provided, however, that,

until entry of the Final Order and without further order of the Court, amounts actually advanced

by the DIP Lenders shall not exceed those amounts set forth in the DIP Budget through the date

of entry of the Final Order (and provided further that the Debtor is authorized to spend all

amounts indicated in the DIP Budget attached to this order, including items stricken in the form

of DIP Budget attached to the Court's September 24, 2010 Interim Order).  Upon their

execution and delivery, the DIP Facility Documents shall constitute legal, valid, and binding

obligations of the Debtor, enforceable against the Debtor in accordance with their terms.  To

the extent that relief is approved at the Final Hearing, but only in accordance with the terms and

conditions of the DIP Facility Agreement and only in the amounts and at the times set forth in

the DIP Budget, the Debtor shall , be entitled to borrow all amounts available under the DIP

Facility Agreement to fund the Debtor's working capital and other general corporate needs and

pay such other amounts required or allowed to be paid pursuant to the DIP Facility Documents,

this Interim Order and any other orders of this Court, including, but not limited to, any amounts

then outstanding with respect to the Revolver.

       3.    DIP Facility Superpriority Claims.  For the Postpetition Indebtedness and

any other of the Debtor's obligations arising under the DIP Facility Documents, the DIP

Lenders and DIP Agent are each granted, pursuant to section 364(c)(1) of the Bankruptcy

Code, subject only to the payment in full in cash of the Carve-Out and, to the extent payable,

the Purchaser Break-Up Fee and Expense Reimbursement, the allowed DIP Facility

Superpriority Claims, which claims shall be payable from and have recourse to, in addition to

the Collateral, any unencumbered prepetition or postpetition property of the Debtor whether

1  now existing or hereafter acquired (other than the Avoidance Actions and proceeds thereof).

2  The DIP Facility Superpriority Claims shall be deemed legal, valid, binding, enforceable, and

3  perfected claims, not subject to subordination, impairment or avoidance other than as provided

4  herein, for all purposes in the Case and any successor case.

5          4.    <u>DIP Facility Liens</u>.  As security for the repayment of the Postpetition

6  Indebtedness arising under the DIP Facility Documents, pursuant to sections 364(c) (2), (c)

7  (3) and (d) of the Bankruptcy Code, the DIP Agent, on behalf of itself and the DIP Lenders, is

8  hereby granted (without the necessity of the execution by the Debtor or the filing, recordation,

9  or execution and delivery of mortgages, security agreements, control agreements, financing

10  statements, or otherwise) the DIP Facility Liens.  The DIP Facility Liens are valid, binding,

11  enforceable and fully perfected as of the date hereof, shall prime and be senior in all respects to

12  the Prepetition Liens, the Replacement Liens (as defined below), and the Junior Prepetition

13  Liens pursuant to section 364(d) of the Bankruptcy Code, and are subject only to the Carve-Out

14  and the Permitted Prior Liens and, to the extent payable, the Purchaser Break-Up Fee and

15  Expense Reimbursement.  As used herein, the term "<u>Permitted Prior Liens</u>") means only such

16  liens and security interests that are (a) valid, enforceable, non-avoidable liens and security

17  interests that are perfected prior to the Petition Date (or perfected after the Petition Date to the

18  extent permitted by section 546(b) of the Bankruptcy Code), (b) not subject to avoidance,

19  reduction, disallowance or subordination pursuant to the Bankruptcy Code or applicable non

20  bankruptcy law and (c) senior in priority to the Prepetition Liens under applicable law and after

21  giving effect to any applicable subordination or intercreditor agreements, including without

22  limitation the Intercreditor and Subordination Agreement between the Debtor, PNC Bank, as

23  agent, and JPM Mezzanine LLC, dated as of May 18, 2007 (as amended from time to time, the

24  "<u>Intercreditor Agreement</u>").

25          5.    <u>Carve-Out</u>.

26          (a)    As used in this Interim Order, the term "<u>Carve-Out</u>" shall mean,

27  to the extent there are not sufficient unencumbered funds available to the Debtor' s estate,

proceeds of Collateral to pay the following expenses: (i) any unpaid fees payable to the U.S. Trustee and Clerk of the Bankruptcy Court pursuant to section 1930 of title 28 of the United States Code (in this regard, the Debtor is ordered to pay any and all such fees as and when due); and (ii) subject to the terms and conditions of this Interim Order, the allowed and unpaid reasonable fees and expenses of retained professionals ("Professionals") employed pursuant to sections 327, 328, 363 and 1103 of the Bankruptcy Code (to include CRG Partners Group, but not to include additional ordinary course professionals) (collectively, the "Professional Fees") by the Debtor or the Committee (X) prior to the Carve-Out Trigger Date (as defined herein) (and including amounts incurred but not invoiced or approved prior to the Carve-Out Trigger Date), an aggregate amount not to exceed the amounts for Professionals for each period as set forth in the DIP Budget, and (Y) following the Carve-Out Trigger Date, an aggregate amount not to exceed $25,000 (items (i) and (ii), collectively, the "Maximum Carve-Out Amount"). As used herein, "Carve-Out Trigger Date" shall mean the earlier of (i) the date on which the DIP Agent provides written notice to the Debtor and counsel to the Debtor, with a copy of such notice to counsel for the Committee, that the Carve-Out is revoked, which notice shall be delivered only on or after and during the continuation of an Event of Default under the DIP Facility and the termination of funding under the DIP Facility; or (ii) the Commitment Termination Date.

(b) Each week, the Debtor shall either (i) set aside in trust with the Debtor's counsel, or (ii) pay, to the applicable Professionals, those amounts set forth in the DIP Budget for Professional Fees; the Maximum Carve-Out Amount shall be reduced each week by the amounts set forth in the DIP Budget for payment of Professional Fees during such week.

(c) Any obligation of the DIP Lenders to fund or otherwise pay any amounts toward the Carve-Out shall be added to and made a part of the Postpetition Indebtedness and secured by the Collateral, and each DIP Lender shall be entitled to all of the rights, claims, liens, priorities and protections under this Interim Order, the DIP Facility Agreement, the Bankruptcy Code, and/or applicable law in connection therewith.

(d)     Notwithstanding anything herein to the contrary, no Prepetition Collateral, Collateral, Cash Collateral, amounts borrowed under the DIP Facility Documents, proceeds of any of the foregoing, or any portion of the Carve-Out shall include, apply to, or be available for, any fees or expenses incurred by any party, including the Debtor or the Committee, in connection with (i) the initiation or prosecution of any claims, causes of action, adversary proceedings, or other litigation against the DIP Agent, any DIP Lender, the Prepetition Agent or any Prepetition Lender, including, without limitation, challenging the amount, validity, extent, perfection, priority, characterization, or enforceability of, or asserting any defense, counterclaim, or offset to, the Postpetition Indebtedness, the DIP Facility Superpriority Claims, or the DIP Facility Liens, (ii) asserting or soliciting or encouraging other parties to assert (A) any claims or causes of action against the DIP Agent, any DIP Lender, the Prepetition Agent or any Prepetition Lender, including, without limitation, claims or actions to hinder or delay the assertion or enforcement of the DIP Facility Liens or Replacement Liens, or realization on the Collateral, in accordance with the DIP Facility Documents or this Interim Order by the DIP Agent, any DIP Lender, the Prepetition Agent or any Prepetition Lender, or (B) any Avoidance Actions against any DIP Agent, any DIP Lender, the Prepetition Agent or any Prepetition Lender, or (iii) the initiation or prosecution of any claims, causes of action, adversary proceedings, or other litigation against the Prepetition Agent or any Prepetition Lender, including, without limitation, challenging the amount, validity, extent, perfection, priority, or enforceability of, or asserting any defense, counterclaim, or offset to, the Prepetition Indebtedness, any Prepetition Loan Document, or the Adequate Protection granted herein; provided, however, that the Committee shall be authorized to use funds allocated in the DIP Budget to (i) investigate the liens, claims and interests of the Prepetition Agent and the Prepetition Lenders, or any other claims or causes of action against the Prepetition Agent or any Prepetition Lender which may be held by the Debtor's estate and (ii) negotiate and/or contest the terms or entry of the Final Order.  The foregoing shall not be construed as consent to the allowance of any Professional Fees and shall not affect the right of the Debtor, the DIP

Agent, the DIP Lenders, the Prepetition Agent, the Prepetition Lenders, the Committee, the U.S. Trustee, or other parties in interest to object to the allowance and payment of any Professional Fees. Payment of any portion of the Carve-Out shall not, and shall not be deemed to, (x) reduce any Debtor's obligations owed to the DIP Agent or any DIP Lender or the Prepetition Agent or any Prepetition Lender or (y) except as expressly provided herein, subordinate, modify, alter or otherwise affect any of the liens and security interests of such parties on and in the Collateral or Prepetition Collateral (or their respective claims against the Debtor).

    6. <u>Investigation Rights</u>. Notwithstanding anything herein to the contrary, until November 29, 2010 (the "<u>Investigation Termination Date</u>") the Committee shall be entitled to investigate the validity, amount, perfection, priority, and enforceability of the Prepetition Liens and Prepetition Indebtedness, or to assert any other claims or causes of action held by the Debtor's estate against the Prepetition Agent or any Prepetition Lender. If the Committee determines that there may be a challenge to the Prepetition Agent or any Prepetition Lender's prepetition liens, claims or security interests, the Committee may, on or before the Investigation Termination Date, file a motion or otherwise initiate an appropriate action (including any motion or other action seeking standing to prosecute such challenge) (each, a "<u>Challenge</u>"), and shall have only until the Investigation Termination Date to file an objection or otherwise initiate an appropriate action setting forth the basis of such Challenge. If a party does not file a Challenge on or before the Investigation Termination Date (or such other later date as extended by the written consent of the Debtor and the Prepetition Agent or by order of this Court), (a) disputing any agreement, acknowledgement, release and/or stipulation contained in paragraph D of this Interim Order, then the agreements, acknowledgements, releases and stipulations contained in paragraph D of this Interim Order which have not been expressly disputed as the basis of a Challenge shall be irrevocably binding on all other parties, the estates, the Committee and all parties in interest (including, without limitation, any receiver, administrator, or trustee appointed in any of the Case or any successor case in any

jurisdiction) without further action by any party or this Court, and (b) the Committee and any other party in interest (including without limitation, any receiver, administrator, or trustee appointed in any of the Case or any successor case or in any jurisdiction) shall thereafter be forever barred from bringing any Challenge with respect to the Prepetition Agent or any Prepetition Lender. If any Challenge is timely filed on or before the Investigation Termination Date, all other claims and actions held by the party filing such Challenge against the Prepetition Agent or any Prepetition Lender not expressly asserted in such Challenge shall be deemed, immediately and without further notice, motion or application to, order of, or hearing before, this Court, to have been forever relinquished, discharged, released and waived. Nothing in this Interim Order (a) confers standing on any party to file or prosecute such claims and actions described herein or (b) precludes the Prepetition Agent or any Prepetition Lender from seeking allowance of all or any portion of the Prepetition Indebtedness prior to the occurrence of the Investigation Termination Date. The Investigation Termination Date may not be extended unless (a) the DIP Agent (on behalf of the DIP Lenders), the Prepetition Agent (on behalf of the Prepetition Lenders), and the Debtor each consent in writing to an extension or (b) the Committee or any party in interest files a motion seeking an extension before the expiration of the Investigation Termination Date and the Court enters an order granting such an extension (regardless of whether such order is entered after the Investigation Termination Date). Notwithstanding anything herein to the contrary, if the Committee has been appointed and upon entry of a Final Order, only the Committee shall be entitled to bring a Challenge on behalf of the Debtor's estate against the Prepetition Agent or any Prepetition Lender; no other party in interest shall be entitled to investigate the validity, amount, perfection, priority, or enforceability of the Prepetition Liens and Prepetition Indebtedness, or to assert any other claims or causes of action held by the Debtor's estates against the Prepetition Agent or any Prepetition Lender.

7.      <u>Section 506(c) and 552(b) Waivers</u>. Effective upon entry of a Final Order providing for such relief, with the exception of the Carve-Out and except as otherwise

permitted by the DIP Facility or this Interim Order, neither the Collateral nor the DIP Agent, any DIP Lender, the Prepetition Agent or any Prepetition Lender, nor any of their claims, shall be subject to any costs or expenses of administration that have been or may be incurred at any time, pursuant to sections 105, 506(c) or 552 of the Bankruptcy Code, or otherwise, by the Debtor or any other party in interest without the prior written consent of the DIP Agent, and no such consent shall be implied from any action, inaction, or acquiescence by any party, including, but not limited to, funding of the Debtor's ongoing operations by the DIP Agent and DIP Lenders. Effective upon entry of a Final Order providing for such relief, the "equities of the case" exception contained in section 552(b) of the Bankruptcy Code shall be deemed waived with respect to the Collateral. Neither the DIP Agent or any DIP Lender, nor the Prepetition Agent or any Prepetition Lender shall be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the Collateral or Prepetition Collateral. The Debtor has represented and warranted that those sums set forth in the DIP Budget are sufficient to pay all costs or expenses of administration that have been or may be incurred, and the Debtor is hereby ordered to use any and all sums borrowed pursuant to the DIP Facility only for purposes of paying those sums set forth in the DIP Budget.

8. <u>Authorization to Use Cash Collateral and Application of Collections and Certain Sale Proceeds.</u> Upon entry of this Interim Order, to the extent that Debtor has cash on hand as of the Petition Date (the "<u>Petition Date Cash</u>"), the Debtor is immediately authorized pursuant to sections 105, 361, 363, 541 and 553 of the Bankruptcy Code and Bankruptcy Rules 2002, 4001 and 9014, to use Cash Collateral up to the amount of the Petition Date Cash for the operation of its business in accordance with the DIP Budget; <u>provided</u>, <u>however</u>, that upon entry of this Interim Order, all cash collected by the Debtor in the ordinary course of its operations shall, except as otherwise expressly provided in the DIP Facility Agreement, be paid to the Prepetition Agent to pay down the Revolver in accordance with the Prepetition Loan Documents. To fund the Debtor's working capital and other general corporate needs pending the Final Hearing, in accordance with the terms of this Interim Order, the <u>DIP Facility</u>

Documents and the DIP Budget, the Debtor may request revolving credit advances under the DIP Facility ("DIP Revolving Credit Advances").  In the event there are out of the ordinary course sales of Prepetition Collateral prior to the Final Hearing, the net cash proceeds of such sales shall be applied to the Revolver in accordance with the Prepetition Loan Documents.  Upon entry of a Final Order providing for such relief, the Debtor shall use DIP Revolving Credit Advances under the DIP Facility to fund the Debtor's working capital and other general corporate needs in accordance with the terms of the Final Order, the DIP Facility Documents and the DIP Budget.

        9.    Adequate Protection of Prepetition Lenders.  In consideration for the use of the Prepetition Collateral (including Cash Collateral) and the priming of the Prepetition Liens, the Prepetition Agent (on behalf of the Prepetition Lenders) shall receive the following (collectively the "Adequate Protection"):

        (a)    Adequate Protection Liens.  To the extent there is a diminution in the value of the Prepetition Lenders' interests in the Prepetition Collateral (whether the reason for such diminution is as a result of, arises from, or is attributable to, any or all of the imposition of the automatic stay (including, without limitation, any diminution in value of such interests in the Prepetition Collateral prior to the Prepetition Agent (on behalf of the Prepetition Lenders) seeking vacation of the automatic stay or the Court granting such relief), the priming of the Prepetition Liens, the use of Cash Collateral or the physical deterioration, consumption, use, sale, lease, disposition, shrinkage, or decline in market value of the Prepetition Collateral), the Prepetition Agent, on behalf of the Prepetition Lenders, is granted replacement liens (the "Replacement Liens") in the Collateral, which Replacement Liens are valid, binding, enforceable and fully perfected as of the Petition Date without the necessity of the execution, filing or recording by the Debtor or the Prepetition Agent of security agreements, pledge agreements, financing statements, or other agreements, and which shall be subordinate only to the Carve-Out, the DIP Liens and the Permitted Prior Liens and, to the extent payable, the Purchaser Break-Up Fee and Expense Reimbursement and shall be equivalent to a lien granted

under section 364(c) of the Bankruptcy Code, and which such Replacement Liens shall cover assets, interest, and proceeds of the Debtor that are or would be collateral under the Prepetition Loan Documents if not for Bankruptcy Code section 552(a), and all cash and cash equivalents (with the exception of the Avoidance Actions and proceeds thereof).

(b)     Administrative Claim.  The Prepetition Agent (on behalf of the Prepetition Lenders) is hereby granted in each of the Debtor's Case an allowed administrative claim (the "Administrative Claim") under Bankruptcy Code section 507(b) with respect to all Adequate Protection obligations, to the extent that the Replacement Liens do not adequately protect the diminution in the value of the Prepetition Lenders' interests in the Prepetition Collateral from the Petition Date, and such Administrative Claim shall be junior and subordinate only to any superpriority claim of the kind specified in, or ordered pursuant to, section 364 of the Bankruptcy Code, the Carve-Out and any Permitted Prior Liens and, to the extent payable, the Purchaser Break-Up Fee and Expense Reimbursement.  The Administrative Claim shall be payable from and have recourse to all prepetition and postpetition property of the Debtor and all proceeds thereof (excluding the Avoidance Actions and proceeds thereof).

(c)     Access.  In accordance with the terms of the Prepetition Credit Agreement, the Prepetition Agent and Prepetition Lenders shall be afforded continued reporting as to Collateral amounts and reasonable access to the Collateral and the Debtor's business premises, during normal business hours, for purposes of verifying the Debtor's compliance with the terms of this Interim Order as it pertains to the Prepetition Agent and Prepetition Lenders.  Such reports shall include but not be limited to (i) those required by the DIP Facility Agreement, and (ii) a weekly report before noon on Tuesday of each week, in form acceptable to the DIP Lenders, comparing actual sales, revenues, and expenses for (x) the week ending on Wednesday of the prior week, (y) the three week period ending on Wednesday of the prior week, and (z) the entire post-petition period ending on Wednesday of the prior week.  In addition, the Debtor shall permit representatives, agents, and employees of the DIP Agent and the DIP Lenders to have reasonable access to the Debtor's premises and records during normal

business hours (without unreasonable interference with the proper operation of the Debtor's businesses) and shall cooperate, consult with, and provide to such representatives, agents, and/or employees all such information as is reasonably requested.

(d)     <u>Adequate Protection Payments</u>.  Subject to the remainder of this paragraph 9(d) and paragraph 11 below, the Debtor shall timely pay to the Prepetition Agent from Cash Collateral or Revolving Credit Advances under the DIP Facility amounts as they accrue in connection with the Prepetition Indebtedness (the "<u>Adequate Protection Payments</u>"), including, without limitation, the current cash payment of interest charged on the Prepetition Indebtedness at the times provided for in the Prepetition Credit Agreement, cash management fees, expenses and charges.

(e)     <u>Allowance of Claims</u>.  Subject to any successful and timely Challenge pursuant to paragraph 6 above, the claims arising from or in connection with the Prepetition Indebtedness are hereby deemed "allowed claims" within the meaning of section 502 of the Bankruptcy Code.

(f)     The automatic stay is modified as to the Prepetition Agent (on behalf of the Prepetition Lenders) to allow implementation of the provisions of this paragraph 9, without further notice or order of the Court.

10.     <u>Adequate Protection of Junior Lender</u>.  In consideration for the use of the Junior Prepetition Collateral (including Cash Collateral) and the priming of the Junior Prepetition Liens, the Junior Lender shall receive the following (collectively the "<u>Junior Adequate Protection</u>"):

(a)     <u>Adequate Protection Liens</u>.  To the extent there is a diminution in the value of the Junior Lenders' interests in the Junior Prepetition Collateral (whether the reason for such diminution is as a result of, arises from, or is attributable to, any or all of the imposition of the automatic stay (including, without limitation, any diminution in value of such interests in the Junior Prepetition Collateral prior to the Junior Lender seeking vacation of the automatic stay or the Court granting such relief, the priming of the Junior Prepetition Liens, the

use of Cash Collateral or the physical deterioration, consumption, use, sale, lease, disposition, shrinkage, or decline in market value of the Junior Prepetition Collateral), the Prepetition Lender is granted replacement liens (the "Junior Replacement Liens") in the Collateral, which Junior Replacement Liens are valid, binding, enforceable and fully perfected as of the Petition Date without the necessity of the execution, filing or recording by the Debtor or the Junior Lender of security agreements, pledge agreements, financing statements, or other agreements, and which shall be subordinate only to the Carve-Out, the DIP Liens, the Permitted Prior Liens to the extent payable, the Purchaser Break-Up Fee and Expense Reimbursement, any all liens and claims of the Prepetition Lenders and the DIP Lenders (including without limitation, the Replacement Liens and the Administrative Claim), and shall be equivalent to a lien granted under section 364(c) of the Bankruptcy Code, and which such Junior Replacement Liens shall cover assets, interest, and proceeds of the Debtor that are or would be collateral under the Junior Loan Documents if not for Bankruptcy Code section 552(a), and all cash and cash equivalents (with the exception of the Avoidance Actions and proceeds thereof).

(b)     Administrative Claim. The Junior Lender is hereby granted in each of the Debtor's Case an allowed administrative claim (the "Junior Administrative Claim") under Bankruptcy Code section 507(b) with respect to all Junior Adequate Protection obligations, to the extent that the Junior Replacement Liens do not adequately protect the diminution in the value of the Junior Lender's interests in the Junior Prepetition Collateral from the Petition Date, and such Junior Administrative Claim shall be junior and subordinate to any superpriority claim of the kind specified in, or ordered pursuant to, section 364 of the Bankruptcy Code, the Carve-Out, any Permitted Prior Liens, any all liens and claims of the Prepetition Lenders and the DIP Lenders (including without limitation, the Replacement Liens and the Administrative Claim) and, to the extent payable, the Purchaser Break-Up Fee and Expense Reimbursement. Subject to the foregoing, the Junior Administrative Claim shall be payable from and have recourse to all prepetition and postpetition property of the Debtor and all proceeds thereof (excluding the Avoidance Actions and proceeds thereof).

11.     Reimbursement of Fees and Expenses.  Subject to entry of the Final Order, the Debtor shall promptly reimburse (i) the DIP Agent and the DIP Lenders in accordance with the DIP Facility Documents and (ii) the Prepetition Agent and the Prepetition Lenders in accordance with the terms of the Prepetition Credit Agreement, for their reasonable costs and fees (including, without limitation, reasonable attorneys' and financial advisors' fees and expenses), charges and expenses, provided however, that the Debtor, upon receipt of invoices from the DIP Agent and DIP Lenders, shall provide copies of the same to counsel for the Committee.  None of such costs, fees, charges, and expenses shall be subject to Court approval or required to be maintained in accordance with the United States Trustee Guidelines and no recipient of any such payment shall be required to file with respect thereto any interim or final fee application with the Court; provided, however, that the Court shall have jurisdiction to determine any dispute regarding the reasonableness of any such costs, fees, charges and expenses; provided further, however, that any payment of costs, fees, charges and expenses due to the Prepetition Agent and the Prepetition Lenders shall be subject to recharacterization as payment of principal in the event, and only to the extent, that the Prepetition Lenders may be determined to be undersecured.  The payment of such fees and costs in amounts in excess of those set forth in the Budget will not result in a breach of the DIP Facility Documents and DIP Agent shall provide additional funding under the DIP Facility to satisfy any such excess fees and costs before such fees and costs are reimbursed.

12.     Restrictions on the Debtor.  Other than the Carve-Out and the Permitted Prior Liens and, to the extent payable, the Purchaser Break-Up Fee and Expense Reimbursement, no claim or lien having a priority superior or *pari passu* with those granted by this Interim Order to the DIP Agent, DIP Lenders, Prepetition Agent or Prepetition Lenders shall be granted by the Debtor, while any obligations under the DIP Facility (or refinancing thereof) or any Prepetition Indebtedness remains outstanding without the written consent of the DIP Agent and Prepetition Agent.  Except as expressly permitted by the DIP Facility Documents and this Interim Order, the Debtor will not, at any time during the Case while any

obligations under the DIP Facility and/or the Prepetition Credit Agreement remain outstanding, grant senior or *pari passu* mortgages, security interests, or liens in the Collateral, the Prepetition Collateral, or any portion thereof pursuant to section 364(d) of the Bankruptcy Code or otherwise.

13. <u>Additional Perfection Measures</u>. Neither the DIP Agent nor any DIP Lender or the Prepetition Agent or any Prepetition Lender shall be required to file financing statements, mortgages, deeds of trust, security deeds, notices of lien, or similar instruments in any jurisdiction, or take any other action, to attach or perfect the security interests and liens granted under the DIP Facility Documents and this Interim Order (including, without limitation, taking possession of or obtaining control over any of the Collateral, or taking any action to have security interests or liens noted on certificates of title or similar documents). Notwithstanding the foregoing, the DIP Agent or any DIP Lender may, in its discretion, file this Interim Order or such financing statements, mortgages, deeds of trust, notices of lien, or similar instruments, or otherwise confirm perfection of such liens, security interests, and mortgages, without seeking modification of the automatic stay under section 362 of the Bankruptcy Code, and all such documents shall be deemed to have been filed or recorded or other action taken on the Petition Date, with the priorities set forth herein; <u>provided</u>, that the failure of the DIP Facility Agent or any DIP Facility Lender to file any such financing statement, mortgage, deed of trust, notice of lien or other instrument, or to otherwise confirm perfection of such liens, security interests or mortgages or make any other such request shall not affect either the perfection or priority of the DIP Facility Liens.

14. <u>Rights with Respect to Certain Prepetition Agreements</u>. The DIP Agent and the DIP Lenders shall have all the rights and benefits with respect to each Blocked Account (as defined in the Prepetition Credit Agreement), any securities or other accounts subject to a Control Letter (as defined in the Prepetition Credit Agreement), each other agreement with a third party (including, but not limited to, any agreement with a landlord, warehouseman, customs broker, or freight forwarder), and each other notification or agreement received or

furnished in connection with the Prepetition Credit Agreement, and all depository banks, blocked account banks, landlords, securities intermediary, warehousemen, customs brokers, freight forwarders and other third parties shall continue to comply, for the benefit of the DIP Lenders, with the terms and conditions of each such agreement or notification, in each such case whether or not, and as if, an additional agreement or notification has been executed or furnished in connection with the DIP Facility. For the avoidance of doubt, the Junior Secured Lender shall comply with the requirements of this paragraph.

15. <u>Access to Collateral – No Landlord's Liens</u>. Upon entry of a Final Order providing for such relief and subject to applicable state law, notwithstanding anything contained herein to the contrary and without limiting any other rights or remedies of the DIP Agent, for the benefit of the DIP Lenders, contained in this Interim Order or the DIP Facility Documents, or otherwise available at law or in equity, and subject to the terms of the DIP Facility Documents and paragraph 16 below, upon written notice to the landlord of any leased premises that an Event of Default has occurred and is continuing under the DIP Facility Documents, the DIP Agent may, subject to any separate agreement by and between such landlord and the DIP Agent (the "<u>Separate Agreement</u>"), enter upon any leased premises of the Debtor for the purpose of exercising any remedy with respect to Collateral located thereon and, subject to the Separate Agreement, shall be entitled to all of the Debtor's rights and privileges as lessee under such lease without interference from such landlord; <u>provided</u>, that, subject to the Separate Agreement, the DIP Agent shall only pay rent of the Debtor that first accrues after the written notice referenced above and that is payable during the period of such occupancy by the DIP Agent, calculated on a per diem basis. Nothing herein shall require the DIP Agent to assume any lease as a condition to the rights afforded to the DIP Agent in this paragraph.

16. <u>Automatic Stay</u>. Any automatic stay otherwise applicable to the DIP Agent and the DIP Lenders is hereby modified so that after the occurrence and during the continuation of any Event of Default under the DIP Facility Documents, and delivery by the DIP Agent of written notice of its intent to exercise remedies (a "<u>Remedies Notice</u>") in each

case given to the Debtor and its counsel, counsel to Purchaser, counsel to the Committee and the United States Trustee, the DIP Agent, the DIP Lenders the Prepetition Agent and the Prepetition Lenders shall be entitled to seek relief from the automatic stay on five (5) business days' notice following delivery of the Remedies Notice (the "Remedies Notice Period"); provided, however, immediately upon the commencement of the Remedies Notice Period and thereafter until the Remedies Expiration Date: (i) the DIP Lenders may charge default rates of interest; (ii) the Debtor shall have no right to use any Collateral except for payment of the Carve-Out, the Adequate Protection Payments, the Prepetition Indebtedness and the Postpetition Indebtedness and, to the extent payable, the Purchaser Break-Up Fee and Expense Reimbursement, or as otherwise provided in the last sentence of paragraph 2 of this Interim Order; and (iii) except as otherwise provided in the last sentence of paragraph 2 of this Interim Order, any obligation otherwise imposed on the DIP Lenders to provide any loan or advance to the Debtor pursuant to the DIP Facility Agreement shall be suspended. During the Remedies Notice Period, the Debtor or the Committee shall be entitled to seek an emergency hearing before the Court on five (5) days business notice to address disputed issues regarding allegations of default under the DIP Facility Documents. At any hearing on a motion by the DIP Lenders for relief from the automatic stay, the DIP Lenders shall have the initial burden of proof at such hearing and the only issue to be determined at such hearing shall be whether an Event of Default under the DIP Facility Documents has occurred and is continuing, and if an Event of Default under the DIP Facility Documents is determined to have occurred and be continuing, the automatic stay will not be re-imposed or continue with respect to the DIP Agent, DIP Lenders, Prepetition Agent or Prepetition Lenders. Notwithstanding the occurrence of an Event of Default under the DIP Facility Documents or termination of the commitments under the DIP Facility Agreement or anything herein to the contrary, all of the rights, remedies, benefits, and protections provided to the DIP Agent and DIP Lenders under the DIP Facility Documents, the Prepetition Agent and the Prepetition Lenders under the Prepetition Loan Documents and this Interim Order shall survive the date of termination of the DIP Facility.

1    This Court shall retain exclusive jurisdiction to hear and resolve any disputes and enter any

2    orders required by the provisions of this paragraph and relating to the application, re-imposition

3    or continuance of the automatic stay with respect to the DIP Agent and DIP Lenders. For the

4    avoidance of doubt, the Remedies Notice Period shall expire no later than the earliest date of

5    cure or waiver of the applicable Event of Default or payment in full in cash of the Postpetition

6    Indebtedness (such date, the "Remedies Expiration Date").

7           17.    Binding Effect. The provisions of this Interim Order shall be binding

8    upon and inure to the benefit of the DIP Agent, DIP Lenders, Prepetition Agent, Prepetition

9    Lenders, the Debtor, the Committee, and their respective successors and assigns, including any

10   trustee hereafter appointed for the estate of any of the Debtor, whether in the Case or any

11   successor case, including the conversion of the Case to a case under chapter 7 of the

12   Bankruptcy Code. Such binding effect is an integral part of this Interim Order.

13          18.    Survival. The provisions of this Interim Order and any actions taken

14   pursuant hereto shall survive the entry of any order (a) confirming any plan under chapter 11 of

15   the Bankruptcy Code in the Case (and, to the extent not satisfied in full in cash, the Postpetition

16   Indebtedness shall not be discharged by the entry of any such order, or pursuant to

17   section 1141(d)(4) of the Bankruptcy Code, each of the Debtor having hereby waived such

18   discharge), (b) approving any sale under section 363 of the Bankruptcy Code, (c) converting

19   the Case to a chapter 7 case unless permitted under the DIP Facility Documents, or (d) to the

20   maximum extent permitted by law, dismissing the Case unless permitted under the DIP Facility

21   Documents, and notwithstanding the entry of any such order, the terms and provisions of this

22   Interim Order shall continue in full force and effect, and the DIP Facility Superpriority Claims,

23   DIP Facility Liens and Adequate Protection granted pursuant to this Interim Order and/or the

24   DIP Facility Documents shall continue in full force and effect and shall maintain their priority

25   as provided by this Interim Order and the DIP Facility Documents to the maximum extent

26   permitted by law until all of the Postpetition Indebtedness is indefeasibly paid in full in cash or

27   otherwise addressed pursuant to a confirmed plan.

19.    <u>After-Acquired Property</u>.  Except as otherwise provided in this Interim Order, pursuant to section 552(a) of the Bankruptcy Code, all property acquired by the Debtor after the Petition Date, including, without limitation, all Collateral pledged or otherwise granted to the DIP Agent, on behalf of the DIP Lenders, pursuant to the DIP Facility Documents and this Interim Order, is not and shall not be subject to any lien of any person or entity resulting from any security agreement entered into by the Debtor prior to the Petition Date, except to the extent that such property constitutes proceeds of property of the Debtor that is subject to a valid, enforceable, perfected, and unavoidable lien as of the Petition Date (or perfected after the Petition Date pursuant to section 546(b) of the Bankruptcy Code) which is not subject to subordination under section 510(c) of the Bankruptcy Code or other provision or principles of applicable law.

20.    <u>Authorization to Act</u>.  The Debtor is authorized to do and perform all acts, to make, execute and deliver all instruments and documents (including, without limitation, the execution of security agreements, mortgages and financing statements), and to pay interest, fees and all other amounts as provided under this Interim Order and the DIP Facility, which may be reasonably required or necessary for the Debtor's full and timely performance under the DIP Facility and this Interim Order, including, without limitation:

(a)    the execution of the DIP Facility Documents;

(b)    the modification or amendment of the DIP Facility Agreement or any other DIP Facility Documents without further order of this Court, in each case, in such form as the Debtor, the DIP Agent, and the DIP Lenders may agree in accordance with the terms of the DIP Facility; <u>provided</u>, <u>however</u>, that (i) notice of any material modification or amendment shall be provided to counsel for the Committee and the U.S. Trustee, each of which will have five (5) business days from the date of delivery of such notice within which to object in writing; (ii) notice of any material modification or amendment of provisions of the DIP Facility Agreement or the DIP Facility Documents related to the Break-up Fee and Expense Reimbursement shall also be given to counsel for Purchaser, which will have five (5) business

1  days from the date of delivery of such notice within which to object in writing; and any such

2  modifications or amendments shall be permitted only pursuant to an order of the Court;

3              (c)        the non-refundable payments to the DIP Agent or the DIP

4  Lenders, as the case may be, of the fees referred to in the DIP Facility Agreement, and

5  reasonable costs and expenses as may be due from time to time as provided in this Interim

6  Order, including, without limitation, reasonable attorneys' and other professional fees and

7  disbursements as provided in the DIP Facility Documents.

8              21.    <u>Insurance Policies</u>.  Upon entry of this Interim Order, the DIP Agent, on

9  behalf of the DIP Lenders, shall be, and shall be deemed to be, without any further action or

10  notice, named as additional insured and loss payee on each insurance policy maintained by the

11  Debtor which in any way relates to the Collateral and each liability insurance policy maintained

12  by the Debtor (other than D&O insurance and any "tail" policy).

13              22.    <u>Subsequent Reversal</u>.  If any or all of the provisions of this Interim Order

14  or the DIP Facility Documents are hereafter modified, vacated, amended, or stayed by

15  subsequent order of this Court or any other court: (a) such modification, vacatur, amendment,

16  or stay shall not affect (i) the validity of any obligation of any Debtor to the DIP Agent, DIP

17  Lenders, Prepetition Agent or Prepetition Lenders pursuant to this Interim Order that is or was

18  incurred prior to such party receiving written notice of the effective date of such modification,

19  vacatur, amendment, or stay (the "<u>Effective Date</u>"), or (ii) the validity, enforceability or priority

20  of the DIP Facility Superpriority Claims, DIP Facility Liens, Adequate Protection or other

21  grant authorized or created by this Interim Order and the DIP Facility Documents that is or was

22  incurred prior to such party receiving written notice of the Effective Date; (b) the Postpetition

23  Indebtedness and Adequate Protection pursuant to this Interim Order and the DIP Facility

24  Documents arising prior to the Effective Date shall be governed in all respects by the

25  provisions of this Interim Order and the DIP Facility Documents in effect immediately prior to

26  the Effective Date; and (c) the use of Cash Collateral and the validity of any financing provided

27  or security interest granted pursuant to this Interim Order and the DIP Facility Documents is

and shall be protected by section 364(e) of the Bankruptcy Code. Notwithstanding any

language in this Interim Order to the contrary, all findings and orders contained in this Interim

Order shall be without prejudice to modification in any Final Order regarding the use of cash

collateral or DIP financing, except that any such modification shall not apply with respect to

any advances made pursuant to either this Interim Order or the prior Interim Order entered

herein (with all such advances governed by the terms of this Interim Order.

23. <u>Effect of Dismissal of Case</u>. If the Case is dismissed or converted, then

neither the entry of such order nor the dismissal or conversion of the Case shall affect the rights

of the DIP Agent and DIP Lenders under their respective documents or this Interim Order, and

all of the respective rights and remedies thereunder of the DIP Agent and DIP Lenders shall

remain in full force and effect as if the Case had not been dismissed, converted, or

substantively consolidated. If an order dismissing the Case is at any time entered, such order

shall provide (in accordance with sections 105 and 349 of the Bankruptcy Code) that (i) the

DIP Facility Liens and DIP Facility Superpriority Claims granted to and conferred upon the

DIP Agent and DIP Lenders and the protections afforded to the DIP Agent and the DIP Lenders

pursuant to this Interim Order and the DIP Facility Documents shall continue in full force and

effect and shall maintain their priorities as provided in this Interim Order until all Postpetition

Indebtedness shall have been paid and satisfied in full in cash (and that such DIP Facility Liens,

DIP Facility Superpriority Claims and other protections shall, notwithstanding such dismissal,

remain binding on all interested parties), (ii) this Court shall retain jurisdiction, notwithstanding

such dismissal, for the purpose of enforcing the DIP Facility Liens, Prepetition Liens, DIP

Facility Superpriority Claims and Adequate Protection, and (iii) any hearing on a motion to

dismiss the Case shall require at least twenty (20) days' prior notice to the DIP Agent, unless

otherwise ordered by the Court for good cause shown.

24. <u>Findings of Fact and Conclusions of Law</u>. This Interim Order constitutes

findings of fact and conclusions of law and shall take effect and be fully enforceable nunc pro

tunc to the Petition Date immediately upon the entry thereof.

25. <u>Controlling Effect of Order</u>. To the extent any provision of this Interim Order conflicts with any provision of the Motion, any documents executed or delivered prior to the Petition Date, or any DIP Facility Documents, the provisions of this Interim Order shall control.

26. <u>Final Hearing</u>. The Final Hearing shall be heard before this Court on **October 22, 2010 at 11:00 a.m.** at the United States Bankruptcy Court for the Western District of Washington, at Seattle, Room 7206.

27. <u>Adequate Notice</u>. The notice given by the Debtor of the Interim Hearing was given in accordance with Bankruptcy Rule 4001(c) (2). Within two (2) business days after the Court's entry of this Interim Order, the Debtor shall mail copies of this Interim Order and notice of the Final Hearing to all parties listed in the Court's mailing matrix. Any party in interest objecting to the relief sought in the Final Order shall submit any such objection in writing and file same with the Court (with a courtesy copy to chambers) and serve (so as to be received) such objection no later than **October 18, 2010 at 5:00 p.m. (PDT).** If service of an objection is accomplished by electronic service on the ECF system, personal service on Debtors' counsel, counsel for the Senior Lenders, counsel for Junior Lender, counsel for Purchaser, and counsel for the Committee shall not be required. If service is accomplished other than by electronic service, service shall be accomplished by hand delivery to Debtors' counsel, counsel for the Senior Lenders, counsel for Purchaser, and counsel for the Committee as indicated on the Court's service list.

Dated: September 29, 2010

_Karen A. Overstreet_
**United States Bankruptcy Judge**
**(Dated as of Entered on Docket date above)**

Presented by:

K&L GATES LLP

By /s/ Michael J. Gearin
   Michael J. Gearin, WSBA #20982
David C. Neu, WSBA #33143
Brian L. Lewis, WSBA #33560
Attorneys for Coast Crane Company

**Exhibit A**
**to Interim Order re DIP Financing**

Modifications to Revolving Credit and Security Agreement

1.     <u>Definitions</u>.  Defined terms used herein, but not defined herein shall have the meanings in the Prepetition Credit Agreement and in the Interim Order to which this Exhibit is attached (as the case may be).

2.     <u>Maximum Revolving Advance Amount.</u>  The definition of "Maximum Revolving Advance Amount" in Section 1.2 of the Prepetition Credit Agreement is amended to read as follows:

> "'Maximum Revolving Advance Amount' shall mean the maximum combined amount of the Prepetition Indebtedness and the Postpetition Indebtedness, as shown in the DIP Budget."

3.     <u>Maximum Revolving Advances</u>.  Section 2.4 of the Prepetition Credit Agreement is amended to read as follows:

> "2.4  <u>Maximum Revolving Advances</u>.  The aggregate principal balance of Revolving Advances outstanding at any time shall not exceed the lesser of (a) the Maximum Revolving Advance Amount, or (b) the Formula Amount, plus an Overadvance not to exceed, at any date, the amounts shown on DIP Budget."

4.     <u>DIP Budget; Use of Proceeds</u>.  Debtor may utilize Advances by DIP Lenders pursuant to the DIP Facility exclusively to pay for the expenses incurred by Debtor as provided for in the DIP Budget.  Debtor represents and warrants that, to the best of the actual knowledge of its Chief Restructuring Officer, after due and reasonable inquiry, (a) the expenditures set forth in the DIP Budget constitute all of Debtor's projected expenses during the period of the DIP Budget, and (b) the sums to be advanced by DIP Lenders pursuant to the DIP Facility and the DIP Budget are sufficient to pay all of the expenses set forth in the DIP Budget and incurred through the last date shown in the DIP Budget.  Subject to the DIP Lenders' consent, Debtor's sales and cash receipts shall not be less than as set forth in the DIP Budget and Debtor's expenses shall not exceed those set forth in the DIP Budget, in all cases subject to the Approved Sales Variance, the Approved Cash Receipts Variance, and the Approved Disbursements Variance (all as defined below, and collectively, the "Approved Variances").  Nothing herein, however, permits the Revolving Advances to exceed the limits set forth in Section 3 above.  As used herein, the Approved Variances include, and are defined and calculated as follows:

> a.     "Approved Sales Variance" means a positive variance, or negative variance of less than 5%, between Debtor's actual sales and Debtor's projected sales measured commencing as of the end of the third week covered by the DIP Budget and each week thereafter for both (i) the three-week period concluding with the week during which the variance is being calculated, and (ii) cumulatively from the commencement of the

bankruptcy case concluding with the week during which the variance is being calculated;

b. "Approved Cash Receipts Variance" means a positive variance, or negative variance of less than 5%, between Debtor's actual cash receipts and Debtor's projected cash receipts measured commencing as of the end of the third week covered by the DIP Budget and each week thereafter for both (i) the three-week period concluding with the week during which the variance is being calculated, and (ii) cumulatively from the commencement of the bankruptcy case concluding with the week during which the variance is being calculated; and

c. "Approved Disbursements Variance" means a negative variance, or a positive variance of less than 5%, between Debtor's actual disbursements and Debtor's projected disbursements measured commencing as of the end of the third week covered by the DIP Budget and each week thereafter for both (i) the three-week period concluding with the week during which the variance is being calculated, and (ii) cumulatively from the commencement of the bankruptcy case concluding with the week during which the variance is being calculated.

5. <u>Eurodollar Rate Loans.</u> Eurodollar Rate Loans will not be available to Borrower. All Loans will be Domestic Rate Loans.

6. <u>Interest Rate.</u>

a. The definition of "Alternate Base Rate", which presently reads:

" 'Alternate Base Rate' shall mean, for any day, a rate per annum equal to the highest of (i) the Base Rate in effect on such day, (ii) the Federal Funds Open Rate in effect on such day plus one-half of one percent (0.50%), and (iii) the Daily Libor Rate plus one percent (1.00%)."

is amended to add a floor to the Daily Libor Rate, so that it reads as follows:

" 'Alternate Base Rate' shall mean, for any day, a rate per annum equal to the highest of (i) the Base Rate in effect on such day, (ii) the Federal Funds Open Rate in effect on such day plus one-half of one percent (0.50%), and (iii) the Daily Libor Rate (but not less than 2.00%) plus one percent (1.00%)."

b. Notwithstanding any provisions of Section 3.1(a) and (b) of the Prepetition Credit Agreement to the contrary, effective on September 24, 2010, the Domestic Rate Loans shall bear interest for each day at a rate per annum equal to the Alternate Base Rate plus 6% per annum.

For avoidance of doubt, the Base Rate is 3.25% and the interest rate on the DIP Facility is 9.25% as of the Petition Date,.

7.    Financial Covenants.  The financial covenants set forth in Section 6.5 of the Prepetition Credit Agreement will not be operative.

8.    No Further Permitted Acquisitions.  No Permitted Acquisitions will be permitted after the date hereof.

9.    No Further Permitted Encumbrances.  The term "Permitted Encumbrances" as used in the Prepetition Credit Agreement shall not include any Liens or other encumbrances arising after the date hereof.

10.    Events of Default.

a.    The following will not constitute "Events of Default":

    i.    the filing of the Chapter 11 Case (notwithstanding Section 10.7 of the Prepetition Credit Agreement);

    ii.    the events specified in Section 10.8 of the Prepetition Credit Agreement (relating to inability to pay debts), Section 10.12 of the Prepetition Credit Agreement (relating to Subordinated Loan Default, to the extent the Subordinated Loan Default consists of the same type of defaults as are set forth in this clause a), and Section 10.17 of the Prepetition Credit Agreement (relating to defaults in other agreements, to the extent the same are caused by the filing of the Chapter 11 case);

    iii.    acts occurring or conditions existing pre-petition;

    iv.    Debtor's failure to cure continuing events of default arising from acts occurring or conditions existing pre-petition, including, but not limited to those relating to the insolvency or financial condition of Debtor at any time before the closing of Debtor's Chapter 11 case; or

    v.    The filing of a motion to appoint a trustee or to convert Debtor's Chapter 11 case to a case under Chapter 7.

b.    Without limiting any other provisions of the DIP Facility Agreement, the occurrence of any of the following shall constitute additional Events of Default under the DIP Facility Agreement and the Prepetition Credit Agreement:

    i.    the appointment of an interim trustee, trustee or examiner for the Debtor, or a change in the current management of the Debtor without DIP Lenders' consent;

ii.      the conversion of Debtor's Chapter 11 case to a case under Chapter 7;

iii.      a change in the venue of Debtor's bankruptcy case;

iv.      Debtor's payment of expenses not set forth in the DIP Budget;

v.      Debtor's failure to stay within all of the Approved Variances at all times;

vi.      the lack of entry of a Final Order in a form acceptable to Lenders in their sole discretion approving the DIP Facility within thirty (30) days after entry of the Interim Order approving the DIP Facility;

vii.      entry of an Order of the Bankruptcy Court amending, supplementing, staying, vacating or otherwise modifying the Interim Order or Final Order approving the DIP Facility without DIP Lenders' prior written consent;

viii.      the filing of a plan of reorganization in this Chapter 11 case which adversely alters DIP Lenders' rights under the DIP Facility or any other Post-Petition Documentation, except to the extent agreed to in writing by DIP Lenders in their sole discretion;

ix.      the entry of an Order by the Court in this case in favor of a third party (I) authorizing post-petition financing or factoring by such third party or (II) granting such third party relief from the automatic stay as to any Pre-Petition Collateral or Post-Petition Collateral with a value in excess of $25,000;

x.      Debtor's failure to have bidding procedures in connection with a sale of substantially all of its assets (a "Sale") approved by the Court on or before October 11, 2010;

xi.      Debtor's breach of the Asset Purchase Agreement dated September 21, 2010 between Debtor and Coast Rainier Acquisition Company (the "APA");

xii.      Termination of the APA for any reason other as a result of approval of an Alternate Transaction with a Qualified Bidder (as those terms are defined in the APA);

xiii.      Debtor's failure to hold a sale hearing with respect to the Sale by November 5, 2010 (with the Sale approved by the Court on that date); and

xiv.      Debtor's failure to consummate the Sale on or before 60 days after the Petition Date, or at the closing of the Sale to pay over to the

Prepetition Agent and the DIP Agent, for the benefit of the Prepetition Lenders and the DIP Lenders, all proceeds of the Sale as approved by the Court up to the entire amount of Obligations then due and owing to the Prepetition Lenders and the DIP Lenders, subject to payment of the Carve-Out and, to the extent payable, the Purchaser Break-Up Fee and Expense Reimbursement.

11. <u>Term</u>. Section 13.1 of the Prepetition Credit Agreement is amended to read as follows:

"This Agreement, which shall inure to the benefit of and shall be binding upon the respective successors and permitted assigns of each Loan Party, the Agent and each DIP Lender, shall continue in full force and effect until the earlier of the following (the "Term") unless sooner terminated as herein provided: (i) 60 days after the Petition Date (the "Date Deadline"), or (ii) the effective date of a Plan of Reorganization in the Chapter 11 Case, or (iii) the effective date of the Sale."

12. <u>Fees</u>. In addition to the other fees provided for in the Prepetition Credit Agreement, Borrower shall pay Agent, for the ratable benefit of the DIP Lenders, the following fees, which are non-refundable:

a. a closing fee in an amount of 2.00% of the DIP Facility Amount, which fee shall be payable on entry of the Interim Order; and

b. an exit fee in an amount equal to 0.50% of the combined amount of the Prepetition Indebtedness and the Postpetition Indebtedness at the date payment is due, which fee shall be payable on maturity of the Postpetition Indebtedness or on any earlier Event of Default.

13. <u>Additional Reporting and Monitoring</u>.

a. <u>Monitoring</u>. Without limiting the rights of the DIP Agent and DIP Lenders, DIP Agent and DIP Lenders and their respective agents shall have the right to monitor and review, on a weekly basis, borrowing base certificates, cash disbursements and rolling cash flow forecasts.

b. <u>Weekly Budget Report</u>. On or before noon on Tuesday of each week, Borrower shall provide DIP Agent and DIP Lenders with a weekly updated cash budget report, which will include but not be limited to the reporting of actual sales and cash disbursements for the period ending Wednesday of the prior week and showing a comparison on a weekly basis to the Budget.

c. <u>Weekly Conference Call</u>. On Wednesday of each week (or less frequently as determined by DIP Agent), Borrower's Chief Financial Officer and CRO shall participate in a conference call with the DIP Agent and DIP

Lenders to discuss the Weekly Budget Report and any other issues that DIP Lenders wish to discuss.

14. <u>Co-Collateral Agent and Documentation Agent</u>. General Electric Capital Corporation (as successor to CitiCapital Commercial Corporation) ("GECC"), shall act as Co-Collateral Agent and Documentation Agent, and in such capacities shall perform such duties assisting the DIP Agent with respect to the Collateral and documentation relating to Borrower, as DIP Agent and GECC shall from time to time agree to in writing.

# Coast Crane Company
## Cash Flow Forecast
($ in 000s)

| Week # | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 10 Weeks Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Week Ending Wed. | 9/29/10 | 10/6/10 | 10/13/10 | 10/20/10 | 10/27/10 | 11/3/10 | 11/10/10 | 11/17/10 | 11/24/10 | 12/1/10 | |
| **NET SALES:** | | | | | | | | | | | |
| Net Sales | | | | | | | | | | | |
| Trade-Related Billings | $650 | $800 | 800 | $650 | $650 | $650 | $800 | $650 | $650 | $650 | $6,950 |
| Equipment Related Billings | 0 | 857 | 0 | 0 | 0 | 1,736 | 141 | 0 | 0 | 0 | 2,734 |
| Net Sales | $650 | $1,657 | $800 | $650 | $650 | $2,386 | $941 | $650 | $650 | $650 | $9,684 |
| **NET CASH FLOW** | | | | | | | | | | | |
| Cash Receipts: | | | | | | | | | | | |
| Trade Receipts | $747 | $800 | $650 | $650 | $650 | $800 | $650 | $650 | $650 | $650 | $6,897 |
| Equipment Receipts | 1,555 | 1,027 | 0 | 687 | 0 | 0 | 1,146 | 141 | 0 | 0 | 4,557 |
| Other Receipts | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | $0 |
| Cash Receipts | 2,303 | 1,827 | 650 | 1,337 | 650 | 800 | 1,796 | 791 | 650 | 650 | $11,454 |
| Operating Disbursements | | | | | | | | | | | |
| Trade A/P | (400) | (400) | (400) | (400) | (500) | (500) | (500) | (500) | (500) | (500) | ($4,600) |
| Payroll | (590) | 0 | 0 | (450) | 0 | (620) | 0 | (450) | 0 | (620) | ($2,730) |
| Misc | (810) | (100) | (100) | (100) | (100) | (100) | (100) | (100) | (100) | (100) | ($1,710) |
| Manitowoc Pmt Plan (Past Due Trade) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | $0 |
| Insurance | 0 | (76) | 0 | (76) | 0 | (76) | 0 | 0 | 0 | (76) | ($304) |
| P Card & Out of Pocket | 0 | (51) | 0 | (51) | 0 | 0 | 0 | (51) | 0 | (50) | ($203) |
| Sales Taxes | 0 | 0 | 0 | 0 | (150) | (400) | 0 | 0 | (150) | 0 | ($700) |
| Property Taxes | (212) | 0 | 0 | (34) | 0 | (112) | 0 | (33) | 0 | (125) | ($516) |
| Equipment Purchases | | | | | | | | | | | |
| New & Spec Equipment Purchases | (1,447) | (714) | 0 | 0 | (759) | 0 | 0 | (1,216) | 0 | 0 | ($4,136) |
| Rental Fleet Equipment Purchases | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | $0 |
| Interest and Principal on Financed Units | 0 | (77) | 0 | 0 | 0 | (48) | 0 | 0 | (77) | 0 | ($202) |
| Equipment Purchases | (1,447) | (714) | 0 | 0 | (759) | 0 | 0 | (1,216) | 0 | 0 | ($4,136) |
| Operating Disbursements | (3,459) | (1,417) | (500) | (1,111) | (1,509) | (1,856) | (600) | (2,350) | (827) | (1,471) | ($15,103) |
| Operating Cash Flow | (1,156) | 410 | 150 | 226 | (859) | (1,056) | 1,196 | (1,559) | (177) | (821) | ($3,649) |
| Cumulative Operating Cash Flow | (1,156) | (746) | (596) | (370) | (1,229) | (2,288) | (1,092) | (2,650) | (2,827) | (3,649) | |
| Non-Operating Disbursements | | | | | | | | | | | |
| Credit Facility Cash Interest Expense | 0 | (196) | 0 | 0 | 0 | (620) | 0 | 0 | 0 | (621) | ($1,437) |
| DIP Loan Facility / Bank Fees | (140) | (1,006) | (40) | (40) | (140) | (40) | (40) | (40) | (140) | (447) | ($2,073) |
| Prof Fees | (80) | (80) | (80) | (80) | (80) | (80) | (80) | (80) | (80) | (80) | ($800) |
| Credit Line Payment / Other | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | $0 |
| Utility Deposits | (50) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | ($50) |
| US Trustee Fees | (20) | 0 | 0 | 0 | (20) | 0 | 0 | 0 | (20) | 0 | ($60) |
| Wind-Down Costs | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | $0 |
| Non-Operating Disbursements | (290) | (1,282) | (120) | (120) | (240) | (740) | (120) | (120) | (240) | (1,149) | ($4,421) |
| Total Disbursements | (3,749) | (2,699) | (620) | (1,231) | (1,749) | (2,599) | (720) | (2,470) | (1,067) | (2,620) | ($19,523) |
| Net Cash Flow | (1,446) | (872) | 30 | 106 | (1,099) | (1,799) | 1,076 | (1,679) | (417) | (1,970) | ($8,059) |
| Cumulative Net Cash Flow | (1,446) | (2,318) | (2,289) | (2,182) | (3,281) | (5,079) | (4,003) | (5,682) | (6,099) | (8,059) | |

Coast Crane Company
Cash Flow Forecast
($ in 000s)

| Week # | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
|---|---|---|---|---|---|---|---|---|---|---|
| Week Ending Wed: | 9/29/10 | 10/6/10 | 10/13/10 | 10/20/10 | 10/27/10 | 11/3/10 | 11/10/10 | 11/17/10 | 11/24/10 | 12/1/10 |
| **LIQUIDITY** | | | | | | | | | | |
| **Availability / (Overadvance)** | | | | | | | | | | |
| (+) A/R | $2,655 | $2,510 | $2,638 | $2,054 | $2,054 | $3,402 | $2,675 | $2,555 | $2,555 | $2,555 |
| (+) Parts Inventory | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| (+) Equip > 6 Months Old Inv. | 2,155 | 2,155 | 2,155 | 2,155 | 2,155 | 2,155 | 2,155 | 2,155 | 2,155 | 2,155 |
| (+) Equip < 6 Months Old Inv. | 0 | 728 | 728 | 728 | 1,968 | 611 | 611 | 611 | 611 | 611 |
| (+) Stabilizers Inv. | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| (+) Used Equip. Inv. | 235 | 235 | 235 | 235 | 235 | 235 | 235 | 235 | 235 | 235 |
| (+) Service Vehicle Inv. | 869 | 869 | 869 | 869 | 869 | 869 | 869 | 869 | 869 | 869 |
| (+) Rental Equipment Inv. | 63,224 | 63,076 | 62,928 | 62,779 | 62,631 | 62,387 | 62,144 | 61,996 | 61,139 | 60,991 |
| (-) Reserves | (5,019) | (5,668) | (5,668) | (5,603) | (6,060) | (6,060) | (5,945) | (4,729) | (4,664) | (4,664) |
| Total Availability | $64,118 | $63,905 | $63,884 | $63,216 | $63,851 | $63,599 | $62,744 | $63,692 | $62,900 | $52,752 |
| (-) Maximum Revolving Advance Amount | (76,820) | (77,692) | (77,662) | (77,556) | (78,655) | (80,453) | (79,377) | (81,056) | (81,473) | (83,443) |
| Availability / (Overadvance) | (12,702) | (13,787) | (13,778) | (14,340) | (14,804) | (16,855) | (16,634) | (17,365) | (18,573) | (20,691) |
| Overadvance) | (12,702) | (13,787) | (13,778) | (14,340) | (14,804) | (16,855) | (16,634) | (17,365) | (18,573) | (20,691) |
| Under / (Over) Limit | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | | | | | | | | |
| Maximum Revolving Advance Amount | 76,820 | 77,692 | 77,662 | 77,556 | 78,655 | 80,453 | 79,377 | 81,056 | 81,473 | 83,443 |
| Max Loan Balance | 76,820 | 77,692 | 77,662 | 77,556 | 78,655 | 80,453 | 79,377 | 81,056 | 81,473 | 83,443 |
| Under / (Over) Limit | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | | | | | | | | |
| **Book Cash** | | | | | | | | | | |
| Beginning Balance | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| (+) Draws | 3,609 | 1,497 | 580 | 1,191 | 1,609 | 1,938 | 680 | 2,430 | 927 | 1,551 |
| (+) Cash Disbursements | (3,609) | (1,497) | (580) | (1,191) | (1,609) | (1,938) | (680) | (2,430) | (927) | (1,551) |
| Ending Balance | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 0 |
| **CREDIT FACILITY** | | | | | | | | | | |
| **Pre-Petition Indebtedness** | | | | | | | | | | |
| Beginning Balance | $75,374 | $73,071 | $71,244 | $70,594 | $69,257 | $68,607 | $67,807 | $66,011 | $65,220 | $64,570 |
| (+) Additions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| (-) Repayments | (2,303) | (1,827) | (650) | (1,337) | (650) | (800) | (1,796) | (791) | (650) | (650) |
| Ending Balance | 73,071 | 71,244 | 70,594 | 69,257 | 68,607 | 67,807 | 66,011 | 65,220 | 64,570 | 63,920 |
| **Post-Petition Indebtedness** | | | | | | | | | | |
| Beginning Balance | 0 | 3,749 | 6,448 | 7,068 | 8,299 | 10,048 | 12,646 | 13,366 | 15,836 | 16,903 |
| (+) Additions for Interest/Fees | 140 | 1,202 | 40 | 40 | 140 | 660 | 40 | 40 | 140 | 1,069 |
| (+) Additions for Non-Lender Disbursements | 3,609 | 1,497 | 580 | 1,191 | 1,609 | 1,938 | 680 | 2,430 | 927 | 1,551 |
| (-) Repayments | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Ending Balance | 3,749 | 6,448 | 7,068 | 8,299 | 10,048 | 12,646 | 13,366 | 15,836 | 16,903 | 19,523 |
| | | | | | | | | | | |
| Maximum Revolving Advance Amount | 76,820 | 77,692 | 77,662 | 77,556 | 78,655 | 80,453 | 79,377 | 81,056 | 81,473 | 83,443 |