Michael J. Gearin, WSBA #20982
David C. Neu, WSBA #33143
Brian L. Lewis, WSBA #33560
K&L Gates LLP
925 Fourth Avenue, Suite 2900
Seattle, WA 98104-1158
(206) 623-7580

Honorable Karen A. Overstreet
Chapter 11
Hearing Location: Seattle, Rm. 7206
Hearing Date: Friday, October 22, 2010
Hearing Time: 11:00 a.m.
Response Date: Monday, October 18, 2010

## UNITED STATES BANKRUPTCY COURT
### WESTERN DISTRICT OF WASHINGTON
### AT SEATTLE

In re:

COAST CRANE COMPANY,

Debtor.

No. 10-21229

DECLARATION OF MATTHEW W. HUDSON IN SUPPORT OF EX PARTE APPLICATION FOR ORDER AUTHORIZING EMPLOYMENT OF OPPENHEIMER & CO. INC. FOR DEBTOR

I, Matthew W. Hudson, being duly sworn, state the following under penalty of perjury.

1.     I am a Managing Director of Oppenheimer & Co. Inc. ("OPCO"), an international investment bank with offices located in the United States, Europe and Asia. Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, information supplied to me by other OPCO professionals, or learned from my review of relevant documents. To the extent any information disclosed herein requires amendment or modification upon OPCO's completion of further review or as additional party in interest information becomes available to OPCO, a supplemental declaration will be submitted to this Court reflecting such amended or modified information.

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

2.      I submit this Declaration to provide the disclosure in connection with the application (the "Application") to retain OPCO as financial advisor and investment banker for Coast Crane Company. ("Debtor"), *nunc pro tunc* to the Petition Date, pursuant to Sections 327(a), 328(a) and 1107(b) of title 11 of the Bankruptcy Code, 11 U.S.C. §§ 101-1330 (the "Bankruptcy Code"), Rule 2014(a) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 2014-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the Western District of Washington (the "Local Rules").

<u>Services to be Provided</u>

3.      OPCO has represented the Debtor on various matters since March 9, 2010, including, without limitation, negotiations concerning the Debtor's restructuring options with the Debtor's major creditors and potential strategic partners.  The retention of OPCO, with its unique knowledge of and experience with the Debtor, will, I believe, contribute greatly to the efficient administration of the estates, thereby minimizing the expense to the estates and facilitating the Debtor's smooth transition in these Chapter 11 Cases.

4.      OPCO is a financial advisory and investment banking services firm that provides a broad range of corporate advisory services to its clients, including in connection with mergers, acquisitions and divestitures, capital raising, corporate restructurings, and related services.  OPCO is a registered broker-dealer with the United States Securities and Exchange Commission, and is a member of the Financial Industry Regulatory Authority and the Securities Investor Protection Corporation.

5.      OPCO has agreed to provide financial advisory services to the Debtor in the above-captioned chapter 11 cases pursuant to the terms and conditions of that certain engagement agreement between the Debtor and OPCO dated March 9, 2010 (the "Engagement Agreement"), a copy of which is attached hereto as <u>Exhibit A</u>.

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

6. The individuals to provide the services as contemplated by the Application have considerable experience in restructuring matters, as well as with equipment sales and rental companies. As such, I believe that OPCO is well qualified to perform the work required in these cases.

#### Disinterestedness

7. In connection with its retention by the Debtor, OPCO (among other things), researched its current corporate client database to determine whether it had any professional connections with any of the persons or entities identified on a list provided to OPCO by the Debtor's counsel (the "Potential Parties in Interest"). That list included:

    a.    the Debtor, its parent and its Canadian subsidiary
    b.    Officers and Directors of Debtor
    c.    Counsel of Debtor
    d.    Counsel to Lenders
    e.    Secured Creditors
    f.    Buyers
    g.    Holders of 5% or More of Any Outstanding Common Equity Securities of the Debtor
    h.    Top 35 Unsecured Creditors
    i.    Listed Contract Counterparties and Lessors

8. OPCO also forwarded the list of Potential Parties in Interest to certain Investment Banking personnel employed by OPCO for each to determine whether any of OPCO or such persons had any material connections with the Potential Parties in Interest.

9. It is important to note that OPCO and its affiliates collectively employ thousands of employees worldwide. As a result, OPCO cannot make any representations regarding potential relationships between Potential Parties in Interest and the entirety of its or its affiliates' individual employees. OPCO did confirm, however, that except as otherwise disclosed in Exhibit B attached to

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

this Declaration, there are no known material connections among Parties in Interest and North American employees in the Investment Banking Department of OPCO (the "Principal Employees").

10. The foregoing inquiries revealed that OPCO or one or more of its affiliates (collectively, the "Oppenheimer Entities") and certain Principal Employees have had or currently have one or more connections with certain of the Potential Parties in Interest on matters unrelated to the proceedings contemplated herein. In particular, to the best of my knowledge, information and belief, the Oppenheimer Entities and/or Principal Employees currently or formerly (a) represent (including by providing financial advisory services), (b) have advisory relationships with, and/or (c) have/had other relationships or connections with those entities identified on Exhibit B attached hereto.

11. Moreover, certain departments of various OPCO Entities may from time to time make a market in, buy or sell, or otherwise effect transactions for customer accounts and for their own account, in securities or debt obligations of the Debtor or other Potential Parties in Interest. However, such departments are physically separate from and are not permitted to share confidential information with the investment banking personnel seeking retention in these Chapter 11 cases. A customary "information wall" exists between OPCO's investment banking group and such other departments. Accordingly, I do not believe that the activities of such other departments constitute a conflict of interest that would disqualify OPCO from providing services described in the Engagement Agreement.

12. One or more of the OPCO Entities and their employees may invest in various investment vehicles that may have relationships to, or connections with, one or more Potential Parties in Interest in the Debtor's Chapter 11 case (the "Investment Funds"). It is possible that one or

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

more Parties in Interest also may have invested in such Investment Funds. Some of the Investment Funds may invest in distressed debt and may hold or acquire debt or other securities of the Debtor. However, OPCO has no control over the investment decisions, including investment purchases, investment divestitures, and the timing of such activities, or other business decisions made at such Investment Funds.

13.     Also, as part of its diverse global activities, the OPCO Entities are involved in numerous transactions, cases and proceedings involving many different professionals, attorneys, accountants and financial consultants, some of which may represent claimants and other Potential Parties in Interest. Furthermore, the OPCO Entities have in the past, and may currently and in the future, be represented by attorneys, law firms and auditors who may be involved in these cases. In addition, the OPCO Entities have in the past, and may currently and in the future, be working with or against other professionals involved in these cases in matters wholly unrelated to these cases. Based on our current knowledge of the professionals involved for the key parties in the Debtor's Chapter 11 cases, none of these business relationships constitute interests materially adverse to the Debtor in connection with the matters upon which OPCO is to be employed, and none are in connection with these cases.

14.     The OPCO Entities collectively are a global financial services firm with broad activities covering trading in securities in addition to OPCO's investment banking and financial advisory practice. With thousands of customers and other commercial relationships around the world, it is possible that one or more of the OPCO Entities' customers, clients or counter-parties to a transaction may hold a claim or otherwise be a party-in-interest in these Chapter 11 cases. Furthermore, as a market-maker in securities, certain of the OPCO Entities regularly enter into

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

securities transactions with other registered broker-dealers. Some of these counter-parties may be creditors of the Debtor or other parties-in-interest. Based on the reviews described herein, OPCO believes that none of these business relationships constitute interests materially adverse to the Debtor's estates herein in connection with the matters upon which OPCO is to be employed, and none are in connection with these cases.

15. OPCO is the only one of the OPCO Entities that is being retained by the Debtor in these Chapter 11 cases. Accordingly, none of the OPCO Entities other than Oppenheimer & Co. Inc. will provide services to the Debtor in connection with this engagement. OPCO maintains internal procedures designed to control the dissemination of confidential information obtained by employees of OPCO to any of the employees of other OPCO Entities not otherwise involved in a transaction who are not otherwise involved in a management, supervisory or legal/compliance position.

16. Although efforts have been made to discover and eliminate the possibility of any conflict, including the efforts outlined above, OPCO is unable to state with certainty whether one of the customers, borrowers, or clients of the OPCO Entities holds a claim or otherwise is a party-in-interest in the Debtor's Chapter 11 cases. If the undersigned discovers any information that is contrary to or pertinent to the statements made herein, the undersigned will disclose such information to the Court on notice to creditors and the United States Trustee.

17. Except as otherwise provided in this Application, to the best of my knowledge, information and belief, insofar as I have been able to ascertain after due inquiry, neither OPCO, nor any Principal Employee of OPCO, (a) is a creditor, equity holder, or insider of the Debtor; and (b) is not and was not, within two years before the date of the filing of the petition, a director, officer, or employee of the Debtor.

K:\2065889\00014\20347_DCN\20347P25XC

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

18.     Moreover, except as otherwise provided in this Application and the attached Exhibits, to the best of my knowledge, information and belief, insofar as I have been able to ascertain after due inquiry, other than in connection with these bankruptcy cases, neither Oppenheimer nor any Principal Employee of OPCO (a) has any material connection with the Potential Parties in Interest or (b) has any connection with or holds or represents any interest materially adverse to the Debtor or any Potential Parties in Interest in the matters for which OPCO is proposed to be retained.

19.     To the best of my knowledge, OPCO has not been retained to assist any entity or person other than the Debtor on matters relating to, or in connection with, these cases. If this Court approves our proposed engagement as financial advisor and investment banker, OPCO will accept no engagement or perform any service in these cases for any entity or person other than the Debtor. OPCO and its affiliates may, however, continue to provide professional services to, and engage in commercial or professional relationships with, entities or persons that may be creditors of the Debtor or parties-in-interest in these Chapter 11 cases, provided, however, that such services do not and will not relate to these Chapter 11 cases.

20.     Accordingly, I believe that OPCO is a "disinterested person" as that term is defined in Bankruptcy Code section 101(14).

21.     If and when additional information becomes available on OPCO's centralized computer systems with respect to any other relationships that may exist between OPCO and Potential Parties in Interest that may affect these cases, supplemental affidavits describing such information shall be filed with this Court.

22.     Within the 12 months preceding the Petition Date OPCO has provided Debtor with professional services rendered in contemplation of or in connection with this matter. The services

DECLARATION OF MATTHEW W. HUDSON IN SUPPORT OF
APPLICATION FOR ORDER AUTHORIZING EMPLOYMENT
OF OPCO - 7

K:\2065889\00014\20347_DCN\20347P26XC

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

1  rendered were similar to those set forth above in the description of professional services for which

2  Debtor seeks to employ OPCO.  Payment for these services and the reimbursement of expenses

3  incurred by OPCO has been made by Debtor in the amount of $506,330.62, including the payment

4  of a $25,000 retainer and $135,000 of fees covering the post-petition period.  The amount charged

5  for such services were substantially similar to those described above, and were, I believe, reasonable

6  in relation to the complexity of the issues, the experience of the professional providing such services,

7  and the prevailing market rate for such services.    OPCO has no agreement or understanding

8

9  concerning the sharing of compensation with any entity outside of the firm receiving compensation.

10

11      23.    As of the Petition Date, the prepetition retainer held by OPCO as an advance toward

12  OPCO's fees and expenses under the Engagement Agreement ("Retainer") was approximately

13  $22,233.82.  OPCO will hold the Retainer for application by OPCO for services rendered and

14  expenses incurred post-petition.

15

16      24.    In addition, OPCO has received approximately $135,000 in Monthly Fees covering

17  the post-petition period (pro rated) for the period from September 21, 2010 through December 11,

18  2010.  OPCO intends to apply a credit of approximately $135,000, representing the fee paid, but not

19  earned, for the period September 22, 2010 through December 11, 2010, against the first transaction

20  fees due and owing OPCO post-petition.

21

22      24.    I certify that I am familiar with and have read Local Rule 2016-1, governing

23  applications for compensation of professionals.

24

25      I declare under penalty of perjury under the laws of the State of Washington and the United

26

K:\20685889\00014\20347_DCN\20347P25XC

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

States that the foregoing is true and correct to the best of my knowledge.

DATED AND SIGNED this 30 day of September, 2010 at _BALTIMORE, MD_.

Matthew W. Hudson

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

**EXHIBIT A**

**ENGAGEMENT AGREEMENT**

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

March 9, 2010

PERSONAL AND CONFIDENTIAL

Coast Crane Company
8250 5th Avenue South
Seattle, WA 98108

Attention: Dan Goodale, CEO

Dear Mr. Goodale:

    This letter agreement confirms the terms under which Coast Crane Company (the "Company") has engaged Oppenheimer & Co. Inc. ("Oppenheimer") on an exclusive basis as its financial advisor, investment banker, placement agent and/or arranger with respect to a possible Restructuring, Sale and/or Financing (each as defined below), and with respect to such other financial matters as to which the Company and Oppenheimer may agree in writing during the term of this engagement.

    For purposes hereof, the term "Company" includes affiliates of the Company and any entity that the Company or its affiliates may form or invest in to consummate a Transaction (as defined below), and shall also include any successor to or assignee of all or a portion of the assets and/or businesses of the Company whether pursuant to a Plan (as defined below) or otherwise. If appropriate in connection with performing its services for the Company hereunder, Oppenheimer may utilize the services of one or more of its affiliates (including without limitation, in connection with a Financing, OPY Credit Corp.), in which case references herein to Oppenheimer shall include such affiliates. From time to time herein, the Restructuring, Sale and/or Financing may be referred to individually or collectively as the "Transaction".

***Services.*** Oppenheimer, as financial advisor, investment banker, placement agent and/or arranger (in each case to the extent applicable) to the Company, will perform the following financial advisory and investment banking services:

    a.    <u>General Financial Advisory and Investment Banking Services.</u> Oppenheimer will to the extent appropriate given the circumstances:

        i.    familiarize itself with the business, operations, properties, financial condition and prospects of the Company;

        ii.    if the Company determines to undertake a Restructuring, Sale and/or Financing, advise and assist the Company in structuring and effecting the financial aspects of such a transaction or transactions, subject to the terms and conditions of this agreement.

b.  **Restructuring Services.**  If the Company pursues a Restructuring, Oppenheimer will to the extent appropriate given the circumstances and as requested by the Company:

    i.    provide financial advice and assistance to the Company in developing and seeking approval of a Restructuring plan (as the same may be modified from time to time, a "Plan"), which may be a plan under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et. seq.* (the "Bankruptcy Code") or otherwise;

    ii.    provide financial advice and assistance to the Company in structuring any new securities to be issued under the Plan;

    iii.    assist the Company and/or participate in negotiations with entities or groups affected by the Plan; and

    iv.    participate in hearings before the bankruptcy court with respect to the matters upon which Oppenheimer has provided advice, including, as relevant, coordinating with the Company's counsel with respect to testimony in connection therewith.

For purposes of this agreement, the term "Restructuring" shall mean any recapitalization or restructuring (including, without limitation, through any exchange, conversion, cancellation, forgiveness, retirement and/or a material modification or amendment to the terms, conditions or covenants thereof) of the Company's equity and/or debt securities and/or other indebtedness, obligations or liabilities (including preferred stock, partnership interests, lease obligations, trade credit facilities and/or contract or tort obligations), including pursuant to a repurchase or an exchange transaction, a Plan or a solicitation of consents, waivers, acceptances or authorizations.

c.  **Sale Service.**  If the Company pursues a Sale, Oppenheimer will to the extent appropriate given the circumstances and at the Company's request:

    i.    provide financial advice and assistance to the Company in connection with a Sale, identify potential acquirors and, at the Company's request, contact such potential acquirors;

    ii.    assist the Company in preparing a memorandum (with any amendments or supplements thereto, the "Sale Memorandum") to be used in soliciting potential acquirors, it being agreed that (A) the Sale Memorandum shall be based entirely upon information supplied by the Company, and (B) the Company shall be solely responsible for the accuracy and completeness of the Sale Memorandum; and

    iii.    assist the Company and/or participate in negotiations with potential acquirors.

For purposes of this agreement the term "Sale" shall mean the disposition to one or more third parties in one or a series of related transactions of (x) all or a substantial portion of the

outstanding equity securities of the Company or one of the Company's subsidiaries or (y) all or a substantial portion of the assets (including the assignment of any executory contracts) or businesses of the Company or its subsidiaries, in either case, including through a sale or exchange of capital stock, options or assets, a lease of assets with or without a purchase option, a merger, consolidation or other business combination, an exchange or tender offer, a recapitalization, the formation of a joint venture, partnership or similar entity or any similar transaction; however such result is achieved, including through a Plan confirmed in connection with any Bankruptcy Case or otherwise, but shall not include the sale of assets in the ordinary course of the Company's business or as part of cost cutting or temporary cash raising activities. The definition of a Sale shall include a transaction or a series of transactions in which a secured creditor or secured creditors acquire all or a portion of the assets, properties or businesses of the Company through a credit bid, but shall not include a foreclosure or similar action involving the Company's secured creditors executing on their collateral whether voluntary or involuntary on the part of the Company or any of its subsidiaries, or any assignment for the benefit of creditors or similar transaction.

      d.    <u>Financing Services.</u> If the Company pursues a Financing, Oppenheimer will, to the extent appropriate given the circumstances and as requested by the Company:

         i.    provide financial advice and assistance to the Company in structuring and effecting a Financing, and identify potential Investors (as defined below);

         ii.    if Oppenheimer and the Company deem it advisable, assist the Company in developing and preparing a memorandum (with any amendments or supplements thereto, the "Financing Offering Memorandum") to be used in soliciting potential Investors, it being agreed that (A) the Financing Offering Memorandum shall be based entirely upon information supplied by the Company, and (B) the Company shall be solely responsible for the accuracy and completeness of the Financing Offering Memorandum; and

         iii.    contact or assist the Company in contacting, and/or participate in negotiations with, potential Investors.

     For purposes of this agreement, the term "Financing" shall mean the placement, sales and/or issuances of (i) one or more classes or series of equity securities, which may take the form of preferred stock, common stock, or securities convertible into, exchangeable for or accompanied by warrants or other rights exercisable for or giving the holder thereof the right to purchase, common or preferred stock (the "Equity Securities") of the Company (the "Equity Financing") and/or (ii) debt securities or other indebtedness, including, without limitation, any secured, unsecured, senior or subordinated debt securities of the Company, including debt securities of the Company with warrants attached thereto (the "Debt Securities"), and/or any secured, unsecured senior or subordinated loan, credit facility (excluding loans under an existing credit facility unless as part of such loan such existing facility is materially modified or amended and such material modification or amendment applies to the entire remaining life of the credit facility through maturity of the debt and does not merely constitute a temporal waiver or forbearance (a "Material Amendment")) or other debt financing made to the Company (such financing, together with any offering of Debt Securities, the "Debt Financing"), regardless of the form or structure of the proposed offerings or issuances, in each case, to a limited number of sophisticated purchasers and/or lenders (collectively, the "Investors"); provided however that a

Financing shall not for the purposes hereof include any Debtor-In-Possession Financing, *provided* that any amount of debt reduction or exchange of debt with existing creditors, or any other modification, amendment or similar matter covered by the definition of a Restructuring shall not be deemed to be a Financing under this agreement.

It is understood and agreed that nothing contained herein shall constitute an expressed or implied commitment by Oppenheimer to underwrite, place or purchase any securities or fund in any way a Financing. It is understood that Oppenheimer's assistance in the Financing will be subject to the satisfactory completion of such investigation and inquiry into the affairs of the Company as Oppenheimer deems appropriate under the circumstances (such investigation hereinafter to be referred to as "Due Diligence") and to the receipt of all internal approvals of Oppenheimer in connection with the Financing. Oppenheimer shall have the right in its sole discretion to terminate this Agreement (or refuse to assist the Company with the Financing) if the outcome of the Due Diligence is not satisfactory to Oppenheimer or if approval of its internal committees is not obtained. Oppenheimer's refusal to assist the Company with the Financing shall not otherwise affect the terms of this engagement.

The Company acknowledges and agrees that Oppenheimer is not, and does not hold itself out to be, an advisor as to legal, tax, accounting or regulatory matters in any jurisdiction. The Company shall consult with its own advisors concerning such matters and shall be responsible for making its own independent investigation and appraisal of the risks, benefits and suitability of the transactions contemplated by this letter agreement, and Oppenheimer shall have no responsibility or liability to the Company with respect thereto.

Notwithstanding anything contained in this letter agreement to the contrary, Oppenheimer makes no representations or warranties about the Company's ability to: (i) successfully improve its operations, (ii) maintain sufficient liquidity to operate its business or (iii) successfully complete a Transaction. The Company agrees that Oppenheimer shall not have any obligation or responsibility to provide accounting, audit, "crisis management" or business consultant services for the Company and shall have no responsibility for designing or implementing operating, organizational, administrative, cash management or liquidity improvements, or to provide any fairness or valuation opinions or any advice or opinions with respect to solvency in connection with any transaction.

*Compensation.* Oppenheimer's compensation for services rendered under this agreement will consist of the following cash fees:

(a) A retainer in the amount of $25,000 (the "Retainer") payable upon execution of this letter agreement (which Retainer, to the extent paid, shall be credited against the first to be paid of the Restructuring Fee, Sale Fee or the Financing Fee.)

(b) A monthly financial advisory fee of $50,000 (the "Monthly Advisory Fee"), which shall be due monthly in advance and paid by the Company beginning on the date hereof and continuing thereafter on the monthly anniversary of such date during the term of this engagement; provided, however, that the Monthly Advisory Fees earned and actually paid to Oppenheimer shall be credited against either the Restructuring Transaction Fee, Sale Transaction Fee or Financing Fee (each as defined below), whichever is first earned and payable to Oppenheimer. If subsequent to such crediting Oppenheimer continues to provide services to the Company under this engagement, additional Monthly Advisory

4

Fees thereafter earned and actually paid to Oppenheimer shall be credited against any subsequent Restructuring Transaction Fee or Financing Fee earned by Oppenheimer. In no event shall the foregoing credit exceed the amount of the actual related fee due and owed to Oppenheimer.

(c)  If at any time during the term of this engagement or within the twelve full months following the termination of this engagement (including the term of this engagement, the "Fee Period"), any Restructuring is consummated or (y)(l) a written agreement in principle, definitive agreement or Plan to effect a Restructuring is entered into and (2) concurrently therewith or at any time thereafter (including following the expiration of the Fee Period), such Restructuring is consummated, Oppenheimer shall be paid a transaction fee, contingent upon the consummation of any such Restructuring and payable at the closing thereof, equal to 5.0% of the gross amount of (i) debt discount captured (ie. amount of outstanding debt forgiven or otherwise reduced) plus (ii) any indebtedness that is converted into equity or otherwise subordinated to its prior ranking (without duplication of the amounts set forth in (i) above) (such amount, the "Restructuring Transaction Fee"), provided however that no such fee pursuant to this section (c) shall be payable unless existing equity holders of the Company as of the day hereof retain at least 10% of the common equity of the Company immediately following the Restructuring (the "Equity Condition") it being understood that if the Equity Condition is not met, but the Board of Directors of the Company otherwise approves a Restructuring, then Oppenheimer shall be paid 50% of the fee that would otherwise be payable upon the consummation of such Restructuring.

The Restructuring Transaction Fee shall be earned and payable upon the earlier of (i) closing of an out-of-court restructuring, or (ii) confirmation of a Chapter 11 plan of reorganization. In the case of (i) above, the Restructuring Transaction Fee shall be payable on the closing of the out-of-court restructuring. In the case of (ii) above, the Restructuring Transaction Fee shall be payable upon confirmation of the plan of reorganization.

(d)  If at any time during the Fee Period, (x) any Sale is consummated or (y)(l) an agreement in principle or definitive agreement to effect a Sale is entered into, and (2) concurrently therewith or at any time thereafter (including following the expiration of the Fee Period) any Sale is consummated, Oppenheimer shall be paid a transaction fee (a "Sale Transaction Fee"), contingent upon the consummation of a Sale and payable at the closing thereof, which shall be equal to 1.75% of the portion of Transaction Value (as defined below) less than or equal to $50 million and 1.25% of the portion of the Transaction Value in excess of $50 million; however, it is contemplated that only the greater of a Restructuring Transaction Fee or a Sale Transaction Fee, but not both, may be earned by Oppenheimer and payable by the Company for the same transaction or series of related transactions.

(e)  If at any time during the Fee Period the Company (x) consummates any Financing or (y)(l) the Company receives and accepts written commitments for one or more Financings (the execution by a potential financing source and the Company of a commitment letter or securities purchase agreement or other definitive documentation shall be deemed to be the receipt and acceptance of such written

commitment) and (2) concurrently therewith or at any time thereafter (including following the expiration of the Fee Period) such Financing is consummated, subject to the limitations below, the Company will pay to Oppenheimer on the closing date of any such Financing, the following (either as placement fees or other compensation):

(i)     1.5% of the aggregate gross proceeds of any new senior secured indebtedness ("Senior Debt") issued, and 3.5% of the aggregate gross proceeds of any new indebtedness ranked junior to any Senior Debt issued; and

(ii)    5.0% of the gross proceeds of any equity or equity-linked securities or obligations issued; and

(iii)   with respect to any other securities or indebtedness issued, such placement fees or other compensation as shall be customary under the circumstances and mutually agreed in good faith by the Company and Oppenheimer (each of (i) to (iii) being referred to herein as a "Financing Fee").

Notwithstanding anything in this section (e) to the contrary, no Financing Fee shall be payable in conjunction with a Financing not otherwise involving a Restructuring unless existing equity holders of the Company as of the date hereof retain at least 25% of the equity of the Company immediately following the Financing (the "Higher Equity Condition") it being understood that if the Higher Equity Condition is not met, but the Board of Directors of the Company otherwise approves a Financing, then Oppenheimer shall be paid 50% of the fee that would otherwise be payable upon the consummation of such Financing.

(f)     $300,000 if the Company obtains a Material Amendment from its lenders under its existing senior and/or second lien credit facilities, which shall be payable in cash upon execution of such amendment (it being understood that such fee shall be payable regardless of whether any Transaction is consummated); and

(g)     Notwithstanding anything to the contrary in this Compensation section (i) if one or more Restructuring Transaction Fees, Sale Transaction Fees or Financing Fees are earned by Oppenheimer hereunder and Oppenheimer's fees for such transaction or transactions total less than $500,000, then Oppenheimer shall be entitled to receive an additional fee, payable at the end of the engagement hereunder, equal to the difference between such fees earned and paid and $500,000, and (ii) the aggregate of Oppenheimer's Restructuring Transaction Fees, Sale Transaction Fee and Financing Fees otherwise earned hereunder shall be capped at $1.5 million if the Restructuring Transaction or the Financing involves any of the parties (and their affiliates) set forth on Schedule B hereto.

As used in this letter agreement, "Transaction Value" means the total value of all consideration (including cash, securities or other property, including any credit bid) received or to be received, directly or indirectly, in connection with a Sale in respect of the assets of the Company or the outstanding securities of the Company on a fully diluted basis (treating any securities issuable upon the exercise of options, warrants or other convertible securities and any securities to be redeemed as outstanding, whether or not vested), plus the principal amount of any debt (including capitalized leases) of the Company outstanding as of the closing date of a

Sale or directly or indirectly assumed, refinanced or extinguished in connection with a Sale, and amounts payable in connection with a Sale in respect of employment or consulting agreements, agreements not to compete or similar arrangements. If the Sale takes the form of a recapitalization or similar transaction, "Transaction Value" will also include the value of all shares retained by the shareholders of the acquired company. If any portion of Transaction Value is payable in the form of securities, the value of such securities, for purposes of calculating our transaction fee, will be determined based on the average closing price for such securities for the 10 trading days prior to the closing of the Transaction. In the case of securities that do not have an existing public market, our Sale Transaction Fee will be determined based on the fair market value of such securities as mutually agreed upon in good faith by the Company and Oppenheimer prior to the closing of the Transaction. Fees on amounts paid into escrow will be payable upon the establishment of such escrow. Fees relating to contingent payments other than escrowed amounts will be calculated based on the present value of the reasonably expected maximum amount of such contingent payments as determined in good faith by the Company and Oppenheimer prior to the closing of the Transaction, utilizing a discount rate equal to the prime rate published in The Wall Street Journal on the last business day preceding the closing of the Transaction.

The Company acknowledges and agrees that the fees payable to Oppenheimer hereunder are reasonable. The Company and Oppenheimer acknowledge and agree that the hours worked, the results achieved and the ultimate benefit to the Company of the work performed, in each case in connection with this engagement, may be variable, and that the Company and Oppenheimer have taken this into account in setting the fees hereunder, and more than one fee may be payable to Oppenheimer under subparagraphs (a), (b), (c), (d), (e) (f) and/or (g) under this Compensation Section in connection with any single transaction or a series of transactions.

In addition to any fees payable by the Company to Oppenheimer hereunder, the Company shall, whether or not any transaction contemplated by this agreement shall be proposed or consummated, reimburse Oppenheimer on a monthly basis for its reasonable travel and other reasonable out-of-pocket expenses (including all reasonable fees, disbursements and other charges of counsel to be retained by Oppenheimer) incurred in connection with, or arising out of Oppenheimer's activities under or contemplated by this engagement. It is understood that, except as otherwise contemplated in Annex A hereto, such travel and out-of-pocket expenses (other than legal expenses) incurred in connection with a Transaction shall not exceed $50,000 in aggregate without prior approval of the Company. Such reimbursements shall be made promptly upon submission by Oppenheimer of statements for such expenses.

To the extent officers or employees of Oppenheimer assist in, or provide testimony in trial or deposition for any action, suit or proceeding relating to a Transaction or our engagement hereunder (other than in connection with a proceeding under Chapter 11 of the Bankruptcy Code where Oppenheimer is asked to testify in its capacity as financial adviser and investment banker to the Company), the Company will pay to Oppenheimer a per diem charge for the services of such officers and/or employees in an amount to be mutually agreed upon by the Company and Oppenheimer prior to such assistance.

*Term.* This engagement shall continue in effect for 12 months from the date of this letter agreement, unless earlier terminated either by the Company or Oppenheimer upon 10 days written notice provided, however, that if this engagement is terminated by the Company prior to four months from the date of this letter, the Company shall be obligated to pay Oppenheimer an

amount equal to four months of the Monthly Advisory Fee less any Monthly Advisory Fees previously paid by the Company. Notwithstanding the foregoing, each of Oppenheimer and the Company agrees that this section and the provisions in this letter agreement relating to the compensation, reimbursement of expenses, indemnification and contribution (including Annex A), confidentiality, other relationships, independent contractor, governing law, submission to jurisdiction and waiver of the right to trial by jury will remain operative and in full force and effect regardless of any termination or expiration of this Agreement or any investigation made by or on behalf of Oppenheimer or any of its affiliates.

*Indemnification.* The Company agrees to indemnify Oppenheimer and certain other entities and persons as set forth in Schedule A attached hereto and incorporated by reference into this agreement.

*Use of Information.* The Company will furnish (or will use its best efforts to cause other potential parties to a Transaction to furnish) to Oppenheimer such information as Oppenheimer requests for purposes of performing services under this letter agreement (the "Information"). The Company hereby agrees and represents that all Information relating to the Company furnished to Oppenheimer (including any Sale Memorandum or Financing Offering Memorandum) will be accurate and complete in all material respects at the time provided, and that, if the Company is aware of any Information becoming materially inaccurate, incomplete or misleading during the engagement hereunder, the Company will promptly advise Oppenheimer. The Company recognizes and confirms that Oppenheimer assumes no responsibility for the accuracy and completeness of the Information (including information available from generally recognized public sources) and will be using and relying on the Information (and information available from generally recognized public sources) without assuming responsibility for independent verification or independent evaluation of any of the assets or liabilities (contingent or otherwise) of the Company.

*Independent Contractor.* The Company acknowledges that Oppenheimer has been retained solely to provide the services set forth in this letter agreement. The Company acknowledges that in performing its services, Oppenheimer shall act as an independent contractor, and not as a fiduciary, agent or otherwise, and any duties of Oppenheimer arising out of its engagements hereunder shall be owed solely to the Company and Oppenheimer shall have no duties or liabilities to, any equity holder of the Company or any third party in connection with its engagement hereunder, all of which are expressly waived. No one other than the Company is authorized to rely upon the engagement of Oppenheimer hereunder or any statements, advice, opinions or conduct by Oppenheimer.

*Confidentiality.* The Company acknowledges that any service, arrangement, proposal, information or advice provided by Oppenheimer to the Company in connection with this engagement is for the confidential use of the senior management, directors, and officers of the Company and, except as may be compelled in a judicial or administrative proceeding or as otherwise required by law or requested by a governmental authority, may not be disclosed or referred to publicly or to any third party without Oppenheimer's prior consent which consent will not be unreasonably withheld or delayed. The Company may share such confidential information with its advisors provided that such persons have a reasonable need to know and expressly agree to comply with this confidentiality provision as is a party hereto.

Oppenheimer will treat confidentially any non-public information relating to the Company provided by the Company to Oppenheimer during this engagement, except as (a) required in order to perform our services under this engagement, including disclosing such information to its officers, employees, agents and other representatives to the extent necessary to perform services under this engagement, (b) such information becomes publicly available other than by disclosure by Oppenheimer in violation of the terms hereof or (c) otherwise required by law or judicial or regulatory process.

*__Other Relationships.__* The Company acknowledges that Oppenheimer or its respective affiliates may from time to time perform various investment banking and financial advisory services for, and have other relationships with, other clients and customers who may have differing interests with respect to the Company or a Transaction and that Oppenheimer and its affiliates shall have no obligation to disclose any information acquired in connection with such relationships to the Company or to use such information in connection with any transactions contemplated with this letter agreement.

The Company acknowledges that Oppenheimer is a securities firm engaged in securities trading and brokerage activities and providing investment banking and financial advisory services. In the ordinary course of business, Oppenheimer or its respective affiliates may at any time hold long or short positions, and may trade or otherwise effect transactions, for their own account or the accounts of customers, in debt or equity securities of the Company, its affiliates or other entities that may be involved in the transactions contemplated hereby. Furthermore, the Company acknowledges that Oppenheimer and its respective affiliates may have fiduciary or other relationships whereby Oppenheimer and its affiliates may exercise voting power over securities of various persons, which securities may from time to time include securities of the Company or others with interests in respect of the Transaction.

*__Anti Money-Laundering.__* To help the United States government fight the funding of terrorism and money laundering activities, the federal law of the United States requires all financial institutions to obtain, verify and record information that identifies each person with whom they do business. This means we must ask you for certain identifying information, including a government-issued identification number (e.g., a U.S. taxpayer identification number) and such other information or documents that we consider appropriate to verify your identity, such as certified articles of incorporation, a government-issued business license, a partnership agreement or a trust instrument.

*__Miscellaneous.__* This letter agreement contains the entire agreement between the Company and Oppenheimer concerning the engagement of Oppenheimer by the Company, and no modifications of this agreement or waiver of the terms and conditions hereof will be binding upon either party, unless approved in writing by both parties. This letter agreement shall be governed by and construed in accordance with the laws of the State of New York. The Company irrevocably and unconditionally submits to the exclusive jurisdiction of any State or Federal court sitting in New York City over any action, suit or proceeding arising out of or relating to this letter agreement, provided that in the event that the Company becomes a debtor under chapter 11 of the Bankruptcy Code, during any such case, any such claims may also be heard and determined in the Bankruptcy Court (as defined below). The Company irrevocably and unconditionally waives any objection to the laying of venue of any such action, suit or proceeding brought in any such court and any claim that any such action, suit or proceeding has been brought in an inconvenient forum.

Each of Oppenheimer and the Company (on its own behalf and, to the extent permitted by law, on behalf of its shareholders) waives any right to trial by jury in any action, suit or proceeding arising out of or relating to this letter agreement.

The Company represents and warrants to Oppenheimer that there are no brokers, representatives or other persons which have an interest in compensation due to Oppenheimer from any Transaction or our services contemplated herein.

In the event that the Company becomes a debtor under chapter 11 of the Bankruptcy Code, the Company shall use its best efforts to promptly apply to the bankruptcy court having jurisdiction over the chapter 11 case or cases (the "Bankruptcy Court") for the approval pursuant to sections 327 and 328 of the Bankruptcy Code of this agreement and Oppenheimer's retention by the Company under the terms of this agreement, and subject to the standard of review provided for in Section 328(a) of the Bankruptcy Code, and not subject to any other standard of review under section 330 of the Bankruptcy Code. The Company shall supply Oppenheimer with a draft of such application and any proposed order authorizing Oppenheimer's retention that is proposed to be submitted to the Bankruptcy Court sufficiently in advance of the filing of such application or the submission of such order, as the case may be, to enable Oppenheimer and its counsel to review and comment thereon. Oppenheimer shall have no obligation to provide any services under this agreement in the event that the Company becomes a debtor under the Bankruptcy Code unless Oppenheimer's retention under the terms of this agreement is approved under Section 328(a) of the Bankruptcy Code by a final order of the Bankruptcy Court no longer subject to appeal, rehearing, reconsideration or petition for certiorari, and which is acceptable to Oppenheimer in all respects. Oppenheimer acknowledges that in the event that the Bankruptcy Court approves its retention by the Company, Oppenheimer's fees and expenses shall be subject to the jurisdiction and approval of the Bankruptcy Court under Section 328(a) of the Bankruptcy Code and any applicable fee and expense guideline orders. In the event that the Company becomes a debtor under the Bankruptcy Code and Oppenheimer's engagement hereunder is approved by the Bankruptcy Court, the Company shall pay all fees and expenses of Oppenheimer hereunder as promptly as practicable in accordance with the terms hereof.

At any time after the consummation of a Transaction, Oppenheimer may, with the approval of the Company (not to be unreasonably withheld), place announcements or advertisements generally describing its representation of the Company but not the specific services being provided hereunder (at Oppenheimer's expense) in such newspapers and publications as it may choose.

Please confirm that the foregoing is in accordance with your understandings and agreements with Oppenheimer by signing and returning to us the duplicate of this letter enclosed herewith.

Very truly yours,

OPPENHEIMER & CO, INC.

By: _____
Matthew W. Hudson
Managing Director

By: _____
Nicholas Tell
Managing Director

CONFIRMED AND AGREED:

COAST CRANE COMPANY

_____
Dan Goodale
Chief Executive Officer

11

## SCHEDULE A

The Company agrees to indemnify and hold harmless Oppenheimer and its affiliates and their respective former and present directors, officers, employees, agents and controlling persons (each such person, including Oppenheimer, an "Indemnified Party") to the fullest extent permitted by law from and against any losses, claims, damages and liabilities, joint or several (individually and collectively, the "Damages"), to which such Indemnified Party may become subject in connection with or otherwise relating to or arising from (i) any transaction contemplated by this letter agreement or the engagement of or performance of services by an Indemnified Party thereunder or (ii) an untrue statement or an alleged untrue statement of a material fact or the omission or alleged omission to state a material fact necessary in order to make a statement not misleading in light of the circumstances under which it was made, and will reimburse each Indemnified Party for all fees and expenses (including the fees and expenses of counsel) (individually and collectively, "Expenses") as incurred in connection with investigating, preparing, pursuing or defending any threatened or pending claim, action, proceeding or investigation (individually and collectively, the "Proceedings") arising therefrom, whether or not such Indemnified Party is a formal party to such Proceeding and in enforcing this letter agreement; provided, that the Company will not be liable to any such Indemnified Party to the extent that any Damages are found in a final non-appealable judgment by a court of competent jurisdiction to have resulted solely from the gross negligence or willful misconduct of the Indemnified Party seeking indemnification hereunder, in which case such Indemnified Party shall promptly reimburse the Company for all payments made by or on behalf of the Company hereunder to or on behalf of Such Indemnified Party. The Company also agrees that no Indemnified Party will have any liability (whether direct or indirect, in contract, tort or otherwise) to the Company or any person asserting claims on behalf of the Company arising out of or in connection with any transactions contemplated by this letter agreement or the engagement of or performance of services by any Indemnified Party thereunder except to the extent that any Damages are found in a final non-appealable judgment by a court of competent jurisdiction to have resulted solely from the gross negligence or willful misconduct of the Indemnified Party.

If for any reason other than in accordance with this letter agreement, the foregoing indemnity is unavailable to an Indemnified Party or insufficient to hold an Indemnified Party harmless, then the Company will contribute to the amount paid or payable by an Indemnified Party as a result of such Damages (including all Expenses incurred) in such proportion as is appropriate to reflect the relative benefits to the Company and/or its stockholders on the one hand, and Oppenheimer on the other hand, in connection with the matters covered by this letter agreement or, if the foregoing allocation is not permitted by applicable law, not only such relative benefits but also the relative faults of such parties as well as any relevant equitable considerations. The Company agrees that for purposes of this paragraph the relative benefits to the Company and/or its stockholders and Oppenheimer in connection with the matters covered by this letter agreement will be deemed to be in the same proportion that the total value paid or received or to be paid or received by the Company and/or its stockholders in connection with the transactions contemplated by this letter agreement, whether or not consummated, bears to the fees paid to Oppenheimer under this letter agreement; provided, that in no event will the total contribution of all Indemnified Parties to all such Damages exceed the amount of fees actually received and retained by Oppenheimer hereunder (excluding any amounts received by Oppenheimer as reimbursement of expenses). Relative fault shall be determined by reference to, among other things, whether any alleged untrue statement or omission or any alleged conduct relates to information provided by the Company or other conduct by the Company (or its employees or other agents) on the one hand, or by Oppenheimer, on the other hand.

The Company agrees not to enter into any waiver, release or settlement of any Proceeding in respect of which indemnification may be sought hereunder without the prior written consent of Oppenheimer (which consent will not be unreasonably withheld), unless such waiver, release or settlement (i) includes an unconditional release of Oppenheimer and each Indemnified Party from all liability arising out of such Proceeding and (ii) does not contain any factual or legal admission by or with respect to any Indemnified Party or any adverse statement with respect to the character, professionalism, expertise or reputation of any Indemnified Party or any action or inaction of any Indemnified Party.

The indemnity, reimbursement and contribution obligations of the Company hereunder will be in addition to any liability which the Company may otherwise have to any Indemnified Party and will be binding upon and inure to the benefit of any successors, assigns, heirs and personal representatives of the Company or an Indemnified Party. The provisions of this Annex will survive the modification or termination of this letter agreement.

## SCHEDULE B

The following represents the list of parties subject to the Oppenheimer fee cap as referenced under Compensation section (g)(ii):

1) Essex Rental Corporation
2) J.V. Driver Projects, Inc.
3) PON Holdings B.V.
4) SSG Private Equity Group of Goldman Sachs
5) Strongco Income Fund

# EXHIBIT B

## Certain Relationships

Oppenheimer & Co. Inc. and or one or more of its affiliates, as of the date hereof, has proprietary positions in, or is deemed the beneficial of securities of WFC, MTW and WY. None of such positions exceed 0.5% of the respective number of outstanding shares.

Current employees of Oppenheimer & Co. Inc. (while employed with a separate advisory firm) assisted William Scotsman in connection with its sale in 2007.

Several employees of Oppenheimer & Co. Inc. own securities of JPM, C, WY, GE and WFC.

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022